STATE of Wisconsin, Plaintiff-Respondent,

v.

Robert P. FETTIG, Defendant-Appellant.†
[Case No. 92–0881–CR.]

STATE of Wisconsin, Plaintiff-Respondent,

v.

TANKCRAFT CORPORATION, Defendant-Appellant.††
[Case No. 92–0882–CR.]

Court of Appeals

*Nos. 92–0881–CR, 92–0882–CR. Oral argument October 6, 1992. — Decided November 18, 1992.*

(Also reported in 493 N.W.2d 254.)

†Petition to review denied.
††Petition to review denied.

429

430

431

On behalf of the defendants-appellants there were briefs by *Stephen M. Glynn* and *Robert R. Henak* of *Shellow, Shellow & Glynn, S.C.* of Milwaukee.

There were oral arguments by *Stephen M. Glynn.*

On behalf of the plaintiff-respondent there was a brief by *James E. Doyle*, attorney general, and *Jeffrey M. Gabrysiak* and *Steven E. Tinker*, assistant attorneys general. There were oral arguments by *Jeffrey M. Gabrysiak.*

On behalf of Fort Howard Corporation, Wisconsin Association of Manufacturers & Commerce, Inc. and Harnischfeger Industries, Inc. there was an *amici curiae* brief by *Gregory B. Conway* and *Donald L. Romundson* of *Liebmann, Conway, Olejniczak & Jerry, S.C.* of Green Bay.

Before Nettesheim, P.J., Brown and Snyder, JJ.

SNYDER, J. This is one of the first appellate cases arising under the criminal penalty provisions of Wisconsins Hazardous Waste Management Act (HWMA), secs. 144.60 to 144.74, Stats. A jury found Tankcraft Corporation and its president, Robert P. Fettig, guilty of wilfully storing and disposing of hazardous wastes without a license. Three issues are raised on appeal: (1) whether the trial court erred by instructing the jury that knowledge that a license is required need not be proved, (2) whether the state failed to prove that the stored toluene was "spent" so as to constitute a hazardous waste, and (3) whether the trial court failed to sufficiently limit the jury's use of certain testimony.

We first conclude that sec. 144.74(2)(b)2, Stats., does not require proof that one who wilfully stores or disposes of hazardous wastes also must know that a license is required to carry on those activities. We hold that the word "wilfully" reaches only to "[s]tores, treats, transports or disposes of;" consequently, the state need prove only that any of those activities was done wilfully and that the person so acted without a license. We also reject the arguments relating to the other two issues and affirm the judgment in its entirety.

The essential facts are these. More will be stated throughout the opinion as necessary. Fettig is the president and sole stockholder of Tankcraft, a company which makes fuel tanks and hydraulic oil reservoir tanks for vehicles and small machinery. Toluene and methylene chloride are two of the chemicals Tankcraft uses. "Clean," or new, toluene is a highly flammable liquid solvent used, among other things, as a paint thinner and to clean paint sprayers. Through such uses, it becomes mixed with paint or contaminated by soil and paint residue. The result in either case is "dirty" toluene. At the time the charges were issued, Tankcraft employees

433

stored dirty toluene in 55-gallon drums, believing it no longer could be used except for wiping down tanks unless it was reprocessed by running it through a distilling unit. In addition, there were some barrels of dirty toluene stored on the premises since 1986 when Fettig acquired Tankcraft. Tankcraft reported the stored waste toluene as an ignitable hazardous waste when it filed original annual hazardous waste reports with the Department of Natural Resources (DNR) in 1986, 1987 and 1988. Tankcraft was not licensed to store dirty toluene.

Methylene chloride is a degreaser used to prepare tanks for painting. A degreaser unit heats the methylene chloride to a vapor which coats the tanks; the vapor then is cooled, condenses to a liquid, and runs down into a holding tank. Tankcraft hired a consultant to investigate a customer complaint that the paint on its tank was not adhering properly. The consultant opined that the degreaser unit was contaminated with oil. Fettig ordered the unit dismantled and the approximately 300 gallons of methylene chloride remaining in the holding tank pumped onto the frozen ground, having been advised the chemical generally evaporates rapidly. Instead, the methylene chloride soaked into the ground, leaving behind an oily stain. Neither Fettig nor Tankcraft possessed a license to dispose of methylene chloride.

Tankcraft was charged in a four-count criminal complaint with wilfully storing spent toluene (Count One), wilfully treating toluene still bottoms (Count Two),[1] wilfully treating paint filters containing chromium (Count Three), and wilfully disposing of spent methylene chloride (Count Four), all without a required license. Fettig was charged as party to the crime on Counts Two, Three and Four. Spent toluene, toluene

---

[1] Toluene still bottoms is the sludge-like material left on the bottom of the distilling unit after toluene is reprocessed.

still bottoms, chromium and spent methylene chloride all are hazardous wastes. Count Three ultimately was dismissed and Count Four was renumbered in an amended information as Count Three.

The trial court instructed the jury as follows:

> It is not necessary for the State to show that the defendant knew that it/he was violating any particular law or knew that the material being disposed was a statutorily defined hazardous waste. It is sufficient that the State show that the defendant knew the material had the potential to be harmful to others othe environment or in other words was not an innocuous substance, like water.

The jury found Tankcraft guilty on Counts One and Three, storage of spent toluene and disposal of spent methylene chloride. It found Fettig guilty on Count Three. Both defendants were found not guilty on Count Two, treatment of toluene still bottoms.

The trial court fined Tankcraft $24,377.60, including costs. It withheld sentence for Fettig, but placed him on probation, ordered eighty hours of community service and fined him $12,227.60, including costs, to be paid from his personal assets and earnings. Tankcraft and Fettig both appeal.[2]

---

[2] Tankcraft and Fettig moved for consolidation of these appeals because the trial court treated the cases as a single proceeding. This court granted the motion by order dated April 29, 1992.

## I. INTERPRETATION OF SEC. 144.74(2)(b), STATS.

### a. Statutory Language

The main issue on appeal is the degree of knowledge or wilfulness necessary for a conviction for storing and disposing of hazardous wastes under sec. 144.74(2)(b), Stats. Tankcraft and Fettig (collectively, Tankcraft) argue that they cannot be convicted because the state did not prove they wilfully did not have a license in other words, that they knew a license was required to store and dispose of hazardous wastes but that they wilfully carried on those activities without obtaining a license.

The trial court instructed the jury that the state need not prove such knowledge. Tankcraft argues that the instruction was erroneous and resulted from the court's misinterpretation of sec. 144.74(2)(b), Stats. Resolution of this issue requires that we interpret sec. 144.74(2)(b). Because interpretation of a statute is a question of law, our review is *de novo. Voss v. City of Middleton,* 162 Wis. 2d 737, 749, 470 N.W.2d 625, 629 (1991).

The sole purpose of statutory interpretation is to discern the intent of the legislature. *Id.* As always, our first resort is to the language of the statute itself. *Id.* Only if the language does not clearly or unambiguously set forth the legislative intent may we look beyond the language and resort to judicial construction to ascertain and carry out that intent. *Id.*

Section 144.74(2), Stats., reads in relevant part:

**144.74 Violations and penalties.**

. . ..

**(2)** CRIMINAL PENALTIES.

436

. . ..
(b) Any person who wilfully does any of the following shall be fined not less than $1,000 nor more than $100,000 or imprisoned for not more than 5 years or both:

. . ..
2. Stores, treats, transports or disposes of any hazardous waste without a license required under s. 144.64 . . ..

The parties disagree on whether the term "wilfully" extends to the phrase "without a license." In its simplest terms, Tankcraft's argument is that the legislatures use of the word "wilfully" indicates that there can be no violation of a legal duty which was not known. Tankcraft argues that the word "wilfully" applies to the full phrase "[s]tores, treats, transports or disposes of any hazardous waste without a license required under s. 144.64." Thus, Tankcraft concludes, a person cannot be found in violation of this law unless the person knew a license was required to store, treat, transport or dispose of a hazardous waste yet undertook one of those activities without obtaining the license. Tankcraft further asserts that, as a criminal statute, sec. 144.74(2)(b) must be narrowly construed in the defendant's favor. *See State v. Bohacheff,* 114 Wis. 2d 402, 417, 338 N.W.2d 466, 473 (1983). *Amici curiae* Fort Howard Corporation, Wisconsin Association of Manufacturers & Commerce, Inc., and Harnischfeger Industries, Inc. concur in this interpretation.[3]

The state reads the statute differently. It contends that "wilfully" applies only to "[s]tores, treats, transports or disposes." The state reasons that because the statute provides that a person is subject to the stated

[3] The brief of *amici curiae* essentially mirrors that of the appellants. Thus, while we acknowledge *amici*'s position, we will not continue to refer to it separately.

penalties only if the person "wilfully *does*" certain acts, "wilfully" modifies activity. Accordingly, "wilfully" must apply only to the recited actions. Knowledge of the need for a license, the state argues, is not an action but a state of mind.

At oral argument, Tankcraft responded that if the legislature meant the statute to be read in that way, it could have drafted the statute to read that "[a]ny person who, without a license, wilfully . . . [s]tores, treats, transports or disposes of any hazardous waste" is subject to penalties. Tankcraft urges that by placing the clause "without a license" after the various prohibited acts, "wilfully" also necessarily pertains to the license requirement.

These opposing, yet reasonable, interpretations by well-informed individuals, as well as our own reading of the statute, convince us that the statute is ambiguous. *See Voss,* 162 Wis. 2d at 750, 470 N.W.2d at 630. The United States Supreme Court also has noted that such statutes are linguistically ambiguous because it is impossible to tell how far down the sentence the word "knowingly" applies. *Liparota v. United States,* 471 U.S. 419, 424 & n.7 (1985). Where a statute is ambiguous about the *mens rea,* or scienter, requirement, we must ascertain the legislature's intended meaning by considering, in addition to the statute's language, its legislative history and purpose, the seriousness of the penalty, and the practical requirements of effective law enforcement. *See State v. Hermann,* 164 Wis. 2d 269, 276-77, 474 N.W.2d 906, 908-09 (Ct. App. 1991).[4]

---

[4] The terms *mens rea* and scienter are interchangeable. *See State v. Collova,* 79 Wis. 2d 473, 479, 255 N.W.2d 581, 584 (1977).

### b. Legislative History

Section 144.74, Stats., is the Wisconsin analog to 42 U.S.C. § 6928(d)(2) of the federal Resource Conservation and Recovery Act (RCRA).[5] The RCRA is a "cradle-to-grave regulatory scheme to ensure that hazardous wastes are properly disposed of." *United States v. Hayes Intl Corp.,* 786 F.2d 1499, 1500 (11th Cir. 1986). Wisconsin's HWMA must implement certain provisions of the RCRA or the DNR loses the authority to administer the RCRA in Wisconsin. *See* Legislative Reference Bureau Analysis, 1987 S.B. 124.

Section 144.74(2)(b), Stats., became law in 1988 as a result of sec. 59, 1987 Wis. Act 384. The bill from which it originated was introduced in the state senate approximately a year earlier as 1987 S.B. 124. The predecessor penalty statute, sec. 144.74(3) and (4), Stats. (1985-86), used "intentionally" instead of "wilfully." Tankcraft devotes a significant portion of its brief to the argument that the term "wilfully" connotes something more stringent than "intentionally." The extensive analysis by the Legislative Reference Bureau is silent as to any intended change in the required level of *mens rea.* Moreover, this court has said on another occasion that Wisconsin rec-

---

[5] 42 U.S.C. § 6928(d) provides for felony punishment for any person who:

(2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter—

    (A) without a permit under this subchapter or pursuant to title I of the Marine Protection, Research, and Sanctuaries Act; or

    (B) in knowing violation of any material condition or requirement of such permit; or

(C) in knowing violation of any material condition or requirement of any applicable interim status regulations or standards.

ognizes no practical difference between the two terms. *See State v. Olexa*, 136 Wis. 2d 475, 483, 402 N.W.2d 733, 737 (Ct. App. 1987). Accordingly, we proceed as though no difference in *mens rea* was intended.

### c. Legislative Purpose

The purpose of the statute is stated in the "Declaration of Policy" in sec. 144.60(2), Stats., which reads in part:

> The legislature finds that hazardous wastes, when mismanaged, pose a substantial danger to the environment and public health and safety. To ensure that hazardous wastes are properly managed within this state, the legislature declares that a state-administered regulatory program is needed which:
>
> . . ..
>
> (b)  Requires the transportation, storage, treatment and disposal of hazardous wastes to be performed only by licensed operators.
>
> (c)  Requires generators of hazardous waste to utilize operators licensed to transport, treat, store or dispose of hazardous wastes.

Although Tankcraft characterizes the statute as a criminal statute, it more accurately is described as a regulatory scheme with potential criminal remedies available. When the legislature's primary goal is to regulate, to accomplish a social good, or to obtain a high standard of care, proof of a criminal state of mind may not be required to achieve the desired result. *Hermann,* 164 Wis. 2d at 279, 474 N.W.2d at 909. Furthermore, it is well-established that criminal penalties attached to regulatory statutes intended to protect public health, in contrast to statutes based on common law crimes, are to be construed to effectuate the regulatory purpose. *United*

440

*States v. Johnson & Towers, Inc.*, 741 F.2d 662, 666 (3d Cir. 1984), *cert. denied*, 469 U.S. 1208 (1985).

This factor militates against the requirement of scienter as to the license requirement because the potential risk to the public is so high. Moreover, where "dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *United States v. International Minerals & Chem. Corp.*, 402 U.S. 558, 565 (1971).

### d. Seriousness of the Penalty

The penalties potentially are severe because each day of a continuing violation constitutes a separate offense. Section 144.74(2)(d), Stats. Tankcraft points out that the storage count alone could have been divided into 351 separate offenses, exposing Fettig, had he been charged in that count, to nearly 1800 years in prison and over $35,000,000 in fines. We first respond that Fettig was not charged in that count, nor was the count split into 351 separate offenses. Also, such a hypothetical punishment is more aptly termed meaningless than severe.

We also respond by saying that the cost of a violation cannot be examined in a void. Economics, not altruism, likely drives most business decisions, and the cost of violation therefore must be compared to the cost of compliance. Because the cost of compliance is high, the cost of violation must be higher to ensure compliance. Looked at in isolation, the penalties for violating the HWMA may appear harsh. When compared to the cost of compliance, however, they appear less so.

### e. The Practical Effects of Enforcing the Law

If ignorance of the licensing aspect of the law were a defense, even egregious, large-scale mishandling of hazardous materials might not result in a conviction. Concern for the environment is not a new phenomenon. It takes a particular naivete, we think, to have no thought that a license might be required. Forcing the state to prove the alleged violator's lack of knowledge in these sorts of cases would be an unnecessary burden.

### f. United States Supreme Court Cases

On several occasions, the United States Supreme Court has examined the general issue of *mens rea* in statutes which do not specifically indicate it must be proved. In some cases, the Court has determined that an offense requires only requisite actions, not a mental element. In *United States v. Freed*, 401 U.S. 601 (1971), for example, a recipient of unregistered hand grenades was charged with violating a statute making it unlawful "to receive or possess a firearm which is not registered to him." *Id.* at 607. The Court held that the government did not have to prove that the defendant knew that the grenades were unregistered because the statute itself set forth no mental element and was a regulatory measure in the interest of the public safety. *Id.* at 607, 609. Furthermore, "one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Id.* at 609.

Similarly, in *International Minerals & Chemical Corp.*, the Court upheld a conviction for knowingly violating an I.C.C. regulation which prohibited shipping hazardous materials without showing them on the shipping papers. The Court held that knowledge of the regulation was not an element of the offense because the

term "knowingly" in the statute referred only to the defendant's knowledge that the materials being shipped were dangerous. *See International Minerals & Chem. Corp.*, 402 U.S. at 563. The Court further stated that "ignorance of the law is no defense," *id.*, especially where "dangerous or deleterious . . . products or obnoxious waste materials are involved [because] the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id.* at 565.

In at least one case, however, the Court reached a different result. *Liparota*, 471 U.S. at 425. That case involved a statute criminalizing the improper use of food stamps. There the Court concluded that in the absence of an indication of contrary intent, the *mens rea* requirement of knowledge should extend to each element of the offense. *Id.* The Court felt it was appropriate to apply the rule of lenity to avoid "criminaliz[ing] a broad range of apparently innocent conduct." *Id.* at 426. Thus, to be convicted, one who "knowingly uses, transfers, acquires, alters, or possesses [food stamps] . . . in any manner not authorized by [the statute] or the regulations" must know that the statute or regulation was violated. *Id.* at 420, 434.

We are persuaded by the Supreme Court's rationale on the general subject. We note first that this is not a *Liparota* case because, unlike the statute in *Liparota*, sec. 144.74(2)(b), Stats., is designed to protect the public health and safety. *See Liparota*, 471 U.S. at 432-33. Public welfare statutes—those which govern the "type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the communitys health or safety"—consistently have been distinguished in Supreme Court precedent as more likely candidates for diminished *mens rea* requirements.

*Id.* at 433. Moreover, the underlying conduct here is not "apparently innocent."

### g. Federal Appeals Court Cases

We also may look to federal decisions interpreting the penalty provisions of the RCRA. Where a Wisconsin statute is similar to a federal statute and there are no Wisconsin cases interpreting the state law, we view the federal decisions in that area as persuasive authority. *Gygi v. Guest,* 117 Wis. 2d 464, 467, 344 N.W.2d 214, 216 (Ct. App. 1984).

On the subject of *mens rea* in the RCRA in particular, most federal appeals courts take the position that the government need not prove that the person charged knew[6] a permit was required to undertake the subject action. *See, e.g., United States v. Dean,* 969 F.2d 187, 190 (6th Cir.), *petition for cert. filed,* (U.S. Nov. 18, 1992) (No. 92-6629).[7] Those conclusions rested in part,

---

[6] 42 U.S.C. § 6928(d)(2) provides felony punishment for a person who "knowingly treats, stores, or disposes of any hazardous waste." Section 144.74(2)(b), Stats., by contrast, provides that "[a]ny person who wilfully does any of the following" is subject to certain penalties. In Wisconsin, "knowingly" and "wilfully" are interchangeable terms. *See State v. Temby,* 108 Wis. 2d 521, 530, 322 N.W.2d 522, 526-27 (Ct. App. 1982). We therefore spend no further time analyzing any possible difference between the two terms.

[7] Both Tankcraft and the state assert that federal appeals courts are divided on the issue of the level of *mens rea* in the RCRA. They both cite a Third Circuit Court of Appeals case which they read as holding that knowledge of the license requirement is an element of the crime of disposing of a hazardous waste. *United States v. Johnson & Towers, Inc.,* 741 F.2d 662, 668 (3d Cir. 1984), *cert. denied,* 469 U.S. 1208 (1985). The real question in that case, however, was whether *employees* as well as *owners and operators* of a hazardous waste facility could be subject to

444

of course, on a reading of the federal statute. Although similar in substance to the Wisconsin statute, the federal statute is structured differently and could yield a different interpretation.[8]

Another underlying rationale of those cases is significant here. That rationale stems from the Supreme Court's holding in *International Minerals & Chemical Corp.* which, in turn, was grounded in the logic that ignorance of the law is no excuse. *See Dean,* 969 F.2d at 191. Likewise here, Tankcraft knew it was involved with "dangerous . . . products or obnoxious waste materials." *Id.* Thus, it also should be presumed to be aware of applicable regulations because of the high probability that such an area is regulated.

We have considered the statute's language, history and purpose, the accompanying penalty and the practicality of enforcement. Those factors together, in our estimation, militate against a scienter requirement. We also have considered the Supreme Court's analysis of comparable statutes and federal appeals courts' analyses of the RCRA. We conclude that the most sensible reading of sec. 144.74(2)(b), Stats., yields this interpretation: the word "wilfully" modifies the ensuing named actions. Those actions are "[s]tores, treats, transports or dis-

---

prosecution if the employees did not know of the license requirement. Thus, although both parties read *Johnson & Towers* to require the government to prove a knowing violation, we are not convinced that it stands for so broad a proposition in all cases.

[8] For an interpretation of the *mens rea* requirement of the federal statute based on how the statute is written and broken into subsections, *see United States v. Dean,* 969 F.2d 187, 191 (6th Cir.), *petition for cert. filed* (U.S. Nov. 18, 1992) (No. 92-6629).

poses." *Id.*[9] Consequently, we hold that to gain a conviction under this section, the state must prove that the person illegally stored, treated, transported or disposed of a hazardous waste. The state also must prove that the person did not have a license as required under sec. 144.64, Stats. The state need not prove, however, that the person knew a license was required.

## II. SUFFICIENCY OF THE EVIDENCE

Tankcraft next claims that the conviction on Count One, wilful storage of spent toluene, cannot stand because the state presented insufficient evidence that the stored toluene was "spent." Only spent toluene is a hazardous waste. *See* Wis. Adm. Code sec. **NR 181.16**, Table II (1988).[10] At the time of the offenses, the administrative code did not define "spent." The trial court instructed the jury that spent material is "any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without being processed."[11]

---

[9] We are construing only that portion of sec. 144.74(2)(b)2, Stats., which states "[s]tores, treats, transports or disposes of any hazardous waste without a license required under s. 144.64" because that is the only portion about which the parties dispute. Thus, we do not decide whether "wilfully" applies to the latter portion of subdiv. 2 relating to violation of a rule, special order or variance, among other things.

[10] At the time of the offenses, the DNR regulations governing hazardous wastes were contained in Wis. Adm. Code sec. **NR 181**. Effective March 1, 1991, the regulations were renumbered to ch. 600.

[11] This definition, essentially the same as the federal one, since has been adopted in Wisconsin. *See* Wis. Adm. Code sec. **NR 600.03**(193).

On reviewing the sufficiency of the evidence, an appellate court may not reverse a conviction unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *State v. Poellinger,* 153 Wis. 2d 493, 501, 451 N.W.2d 752, 755 (1990). The same standard holds whether the evidence is circumstantial or direct. *Id.*

The state elicited testimony that before the charges were issued, Tankcraft followed a practice of not using dirty toluene unless it was first distilled. James Raymond, a quality assurance manager at Tankcraft whose duties included environmental matters, testified that he placed hazardous waste labels on the barrels of stored toluene. Edward Beam, a Tankcraft painter, testified that he would use clean toluene just once, then store it in a vault in 55-gallon drums. He stated that experimentation with dirty toluene showed that it was effective in thinning paint, but that it did not work well for cleaning equipment and tanks. In 1987, Tankcraft began distilling the dirty toluene, a practice discontinued after a fire destroyed the distilling unit in January 1989. Beam testified that at the time of trial, Tankcraft was using dirty toluene for a number of purposes, including to thin paint, clean paint lines, wipe tanks clean and clean up paint spills.

Tankcraft argues that because the testimony also showed that dirty toluene was being used at the time of trial for virtually the same purposes as was clean toluene, a reasonable jury could not have concluded that the dirty toluene was "spent." Where the evidence could support contrary inferences, the trier of fact is free to choose

among conflicting inferences and may, within reasonable bounds, reject an inference which is consistent with the innocence of the accused. *Id.* at 506, 451 N.W.2d at 757. It is for the trier of fact, not this court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Thus, unless the evidence upon which those inferences are based is incredible as a matter of law, we are bound by them. *Id.* at 506-07, 451 N.W.2d at 757. "If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it." *Id.* at 507, 451 N.W.2d at 758. We conclude that sufficient credible evidence and the inferences reasonably drawn from it support the jury's determination that, without reprocessing, the dirty toluene no longer could be used for the purpose for which it was produced and thus was "spent."

### III. HEARSAY STATEMENTS

The final issue is whether the trial court abused its discretion by refusing to give a requested limiting instruction regarding the jury's use of certain statements which Tankcraft asserts are hearsay. The statements related to the findings of a consultant who attempted to determine the problem with the methylene chloride degreaser unit. The consultant had opined that a defect in the degreaser unit caused the methylene chloride to become contaminated with oil. After rendering its opinion, Fettig ordered the methylene chloride to be pumped onto the frozen ground. At trial, three Tankcraft employees—Darrell Crusan, James Kloster and Roger Schmitt and a DNR investigator—Sandra

Miller—testified regarding the consultant's findings. Tankcraft objected to two of the witnesses' testimony but not to that of the other two. The trial court permitted the testimony because it agreed with the state that the testimony was not offered for the truth of the matter but to show that Tankcraft took certain actions based on the consultant's conclusion's.

An evidentiary ruling on the admissibility of hearsay evidence will be sustained unless the ruling was an abuse of discretion. *Heggy v. Grutzner,* 156 Wis. 2d 186, 200, 456 N.W.2d 845, 851 (Ct. App. 1990). A party loses the right to appellate review if he or she fails to timely object to the testimony. *See id.* at 199, 456 N.W.2d at 851. Furthermore, a trial court has wide discretion in instructing the jury. *State v. Herriges,* 155 Wis. 2d 297, 300, 455 N.W.2d 635, 637 (Ct. App. 1990). If the instructions given adequately explain the law applicable to the facts, that is sufficient and there is no error in the trial court's refusal to use the specific language requested by the defendant. *Id.* Where inadmissible evidence is admitted, it is harmless error where there is no reasonable possibility that the error contributed to the final result. *See State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-32 (1985).

Tankcraft objected during Crusan's and Kloster's testimony but did not object during Schmitt's or Miller's. It later sought the following limiting instruction:

> During the trial, I allowed Roger Schmitt to testify to statements made by an unidentified consultant from Ingersoll Rand. The unidentified person's statements dealt with the alleged presence of oil in methylene chloride in the degreaser unit.

I now instruct you that that testimony was not admitted for the purpose of proving the truth of what the unidentified person said.

Rather, this testimony was admitted only for the limited purpose of attempting to show that, based on this unidentified person's statements, either or both defendants may have taken certain action.

I charge you that it would be a violation of your oaths as jurors to consider the alleged statements of the unidentified Ingersoll Rand consultant for the truth of the matters he allegedly asserted.

The state objected to the last paragraph because Tankcraft had not objected earlier to Miller's testimony about what Fettig told her regarding the consultant's opinion. Although asserting that Fettig's statement to Miller reflected double hearsay, Tankcraft withdrew its request for the last paragraph, and the first three were given as requested.

Tankcraft asserts that the statements *were* offered for their truth and thus were hearsay because they asserted that the methylene chloride was contaminated. This error was not harmless, Tankcraft contends, because it went directly to part of the state's proof—that the methylene chloride was "spent." The state first argues that Tankcraft's failure to object to each witness' testimony resulted in a waiver of the right to objection. Tankcraft contends waiver did not result because "[a] timely request to limit the evidence to a specific purpose is sufficient." 7 D. BLINKA, WISCONSIN PRACTICE—EVIDENCE § 106.1 at 28 (1991).

We do not decide whether a waiver situation is presented because even if the testimony was inadmissible hearsay and the jury misinterpreted its relevance, we conclude there were sufficient independent facts to support the jury's finding.

Crusan, for example, testified that he told DNR officials that paint was not adhering to the tanks because the methylene chloride in the degreaser unit was fifty percent methylene chloride and fifty percent oil. Kloster testified that although he could not say from personal knowledge whether the methylene chloride was contaminated with oil, he did see some in a pail and it was "dark in color" and it did not evaporate as pure methylene chloride typically does. He also testified that he later wrote in a report that the methylene chloride was contaminated with oil and dirt, that he based that conclusion on his own observations, that he told Fettig the methylene chloride was dirty, and that he tried to arrange for disposal of the material. James Raymond testified that the methylene chloride was no longer usable for the purpose for which it had been purchased because it was not cleaning as it should have done.

In sum, we disagree that admitting testimony regarding the consultant's opinion that the methylene chloride was unusable because it was contaminated with oil was prejudicial error. The jury was instructed to consider the testimony not for its truth but for its impact on Tankcraft's subsequent decisions. Even if the state relied in closing arguments on the truth of the statements, there was sufficient independent evidence to show that the methylene chloride was spent. If there was error, it was harmless.

*By the Court.*—Judgment affirmed.