COURT OF APPEALS
DECISION
DATED AND FILED

December 28, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.        **2020AP1496-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF1681

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

PAUL B. JONES,

DEFENDANT-APPELLANT.

APPEAL from a judgment and orders of the circuit court for Brown County: JOHN ZAKOWSKI, Judge. *Judgment reversed; orders affirmed in part and reversed in part; cause remanded for further proceedings*.

Before Stark, P.J., Hruz and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.  Paul Brian Jones appeals from a judgment, entered following a bench trial, convicting him of first-degree sexual assault of a child under thirteen years old and from orders denying him postconviction relief.  Jones was charged in November 2016, after Devin,[1] then a five-year-old boy, reported that "Brian" had touched his penis while he was at his father's home.  Jones was known colloquially as "Brian," and he was the only adult male present when the alleged sexual contact occurred.

¶2      Jones argues that insufficient evidence existed to convict him of the charged crime because while Jones was present in the courtroom, Devin testified that "Brian" was not present in the courtroom, and because Jones and his girlfriend, Johnnie Maria ("Maria"), both testified that Jones never touched Devin.  We disagree that the evidence was insufficient.  Viewing the evidence in the light most favorable to the State and the conviction, a reasonable fact finder could find that someone had sexual contact with Devin and that Devin identified Jones as the offender by consistently stating that Brian had touched him.  We therefore affirm the circuit court's order denying postconviction relief on insufficient evidence grounds.

¶3      Jones also argues that he is entitled to a new trial because the circuit court relied on extraneous information when reaching its verdict.  He contends that the court improperly relied on its own knowledge of sexual abuse victims experiencing nightmares and changes in behavior after an assault, and that it improperly researched case law regarding the legal effect of a victim being unable

---

[1] We refer to the victim and his parents using pseudonyms, pursuant to the policy underlying WIS. STAT. RULE 809.86 (2019-20).  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

to identify the defendant in court. Although we reject Jones's argument that the court improperly researched case law, we agree that the court improperly relied on its own knowledge of sexual abuse victims experiencing nightmares and changes in behavior. Such knowledge was not based on evidence admitted at trial, nor was it within the common knowledge of a layperson. We therefore reverse Jones's conviction and remand for a new trial.[2]

## BACKGROUND

¶4 On Sunday, November 20, 2016, Devin was staying with his father, Daniel, for the weekend. At the time, Daniel lived with his brother Craig, his cousin Maria, Maria's daughter, and Jones—Maria's longtime boyfriend. Daniel and Craig knew Jones colloquially as "Brian," and Daniel testified that Jones was the only person known as "Brian" in the home.

¶5 That Sunday afternoon, Daniel and Craig left home to run errands. They both testified that Devin was sleeping on the couch in the living room when they left and that they asked Maria to watch Devin while they were away. Maria was in her bedroom at the time Daniel asked her to watch Devin. Craig and Daniel testified that Jones, Maria and Devin were the only people in the home when Daniel and Craig left.

¶6 When Daniel and Craig returned home a couple hours later, Craig observed Jones and Devin on the living room couch. Craig testified that Jones

---

[2] Because we reverse and remand for a new trial based on the circuit court's reliance on facts not admitted into evidence, we need not address Jones's other arguments that his trial counsel provided ineffective assistance and that Jones was denied his right to a jury trial. *See* *Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716.

quickly "jumped off [the] couch" and sat down in a black folding chair. Meanwhile, Devin ran up to his father, gave him a hug, and said, "[D]ad, I'm glad you're home." Craig also observed that the door to Maria's bedroom was closed when he arrived, but he saw Maria sitting in her room when Jones later entered and exited the bedroom. Daniel then fed Devin dinner and prepared him to go back to his mother's home.

¶7 After dinner, Daniel and Craig met Devin's mother, Demi, to exchange their physical placement of Devin. Demi took Devin home and instructed him to take a shower. As Devin finished showering, he told his mother that his penis hurt, explaining that "Brian" had touched Devin's penis while he was at his father's home. Demi called Daniel to ask if he knew anything about a person named "Brian" and about Devin's comments. Daniel became upset and asked to speak to Devin directly. Devin subsequently confirmed to his father that Brian had touched him. After speaking to his son, Daniel reported Devin's comments to law enforcement.

¶8 Over the next several days, Devin spoke to two police officers and a forensic interviewer with the Child Advocacy Center. During the video-recorded forensic interview, Devin described staying with his dad the previous Sunday. He initially said that his "Uncle Craig," "grandma," "grandpa," and a girl lived with his dad, but he later stated that his dad, his uncle, "Brian," and "the girl" slept at his uncle's home. Devin told the forensic interviewer that "Brian" had squeezed Devin's penis while Devin was watching football and while his father and uncle were at the store. When asked how the touching stopped, Devin said that Brian "chopped" Devin's penis before letting go. Upon further questioning, Devin clarified that Brian "chopped" Devin's penis "like a lobster." Devin stated that his grandma and grandpa were in their room and that Brian was watching him at the

4

time. Devin initially described Brian as "the brown boy that's big," but he later stated that Brian was a "grown-up." He also described Brian as having "tall" black hair.

¶9 The State subsequently charged Jones with one count of first-degree sexual assault of a child under the age of thirteen, pursuant to WIS. STAT. § 948.02(1)(e). The case was tried to the circuit court. Devin, then six years old, testified at trial that "Brian" had touched his penis while he was staying at his uncle's home in November 2016. Devin stated that he was watching television when Brian put his hand inside of Devin's pants for about a minute. Devin testified that he felt sad and a little scared when Brian touched him. Devin further testified, however, that he was not afraid of Brian. Despite Jones's presence, when asked two separate times whether he saw Brian in the courtroom, Devin said, "No." Devin did state, however, that Brian was an adult male with dark skin. He recalled seeing Brian a total of two times.

¶10 Maria also testified regarding her recollection of November 20, 2016. She testified that she did not want to watch football, so she went into her bedroom to watch the Andy Griffith Show. Maria further testified that the door was "open wide" at all times and that she could see both Jones and Devin "very clearly." Maria stated that she continued to talk to Jones while he was in the living room, and he never left her sight. Maria testified that there was "no way" Jones touched Devin in a sexual manner.

¶11 Finally, Jones testified in his own defense, denying that he ever touched or went near Devin on the afternoon in question. Jones testified that after Devin woke up, Jones went into the living room to watch football. Jones stated that he did not speak to Devin much, except when Devin asked where his father

was and whether he could have a cookie and juice. Jones denied sitting on the couch and "hopping" up when Daniel and Craig returned home. Jones explained that the couch did not provide enough support for him and that a stroke he suffered in 2016 did not allow him to "hop."

¶12 The circuit court found Jones guilty of the charged count. The court first recognized that the case largely turned on the credibility of the witnesses. Beginning with Maria, the court accepted her testimony that she never saw Jones touch Devin. The court did not believe, however, that Maria watched Jones the entire time Daniel and Craig were gone, noting that she was not in the same room as Jones and Devin, and that the touching only lasted about one minute.

¶13 The circuit court found Daniel credible despite his bias as Devin's father. The court recognized that Daniel might reasonably notice and remember Jones sitting on the couch and standing up quickly because Jones never sat on the couch, which was consistent with Jones's own testimony. Despite Jones's post-stroke condition, the court did not think it unreasonable that Jones might quickly stand up if startled. In addition, the court found most of Craig's recollection and testimony consistent with Daniel's testimony, despite some reasonable variations.

¶14 The circuit court then considered Jones's testimony, noting that he seemed "pretty credible," but it also recognized that Jones had a major interest in the result of the trial. The court acknowledged that Jones had no burden of proof at trial, but it could not find any rational explanation for why Devin would fabricate the incident.

¶15 The circuit court next considered Demi's testimony and concluded that she had "no ax to grind" with Jones. The court found that Devin reported the

incident in a reasonable way to Demi, bringing up the issue on his own and telling his mother that he was in pain. The court discussed Demi's testimony regarding Devin's behavioral changes and nightmares. The court, relying on its own experience from prior cases, recognized that nightmares and changes in behavior are consistent with a child who has been sexually assaulted.

¶16　Finally, the circuit court found that Devin did not have an interest in the result of the trial, nor did he have any interest in reporting to his mother that his penis hurt while he was taking a shower. The court found that Devin could tell right from wrong, and he knew it is right to tell the truth. The court also found that Devin described the incident in a reasonable way during his forensic interview and during his testimony. Specifically, the court noted that, in a child's world, it would be reasonable to describe a painful pinch as being "[chopped] like a lobster."

¶17　The circuit court expressed concern over Devin's inability to identify Jones at trial. But the court reiterated that Devin "testified as to what happened, his penis was squeezed. He said it was Brian." When questioning whether Devin was lying or whether he could not remember Jones, the court recognized that

> [t]he one thing that was consistent throughout these proceedings and the testimony of the many witnesses is that he always indicated the person who squeezed his penis was Brian.
>
> And the only person that was there in that residence[,] was a male and [was] named Brian, or identified as Brian[,] is Mr. Jones.

The court then proceeded to discuss its own legal research on whether Devin's failure to identify Jones in court was dispositive of the State's case, and the court concluded that the failure to identify Jones was not dispositive. *See **State v. David***

7

*J.K.*, 190 Wis. 2d 726, 740-41, 528 N.W.2d 434 (Ct. App. 1994). The court found that Devin's failure to identify Jones was reasonable and could be explained by Devin not wanting to offend Jones, by Devin being scared of Jones, or by Jones looking different at trial than he did when the incident occurred.

¶18 Following Jones's conviction, the circuit court imposed a thirteen-year sentence, consisting of eight years' initial confinement and five years' extended supervision. Jones subsequently moved for postconviction relief, raising multiple claims for relief. The court held evidentiary hearings, including a *Machner* hearing,[3] on Jones's claims. The court denied relief on all of Jones's claims, except for an inaccurate information claim. The court amended Jones's sentence to seven years' initial confinement and six years' extended supervision. Jones now appeals.

## DISCUSSION

### I. Sufficiency of the evidence

¶19 Jones argues that insufficient evidence existed to convict him of the charged offense. In reviewing a sufficiency of the evidence claim, we will uphold a conviction unless the evidence, viewed most favorably to the State and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *State v. Sholar*, 2018 WI 53, ¶45, 381 Wis. 2d 560, 912 N.W.2d 89. We must decide a sufficiency of evidence claim even if there are

---

[3] *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

other grounds for reversing the conviction that would not preclude retrial. *State v. Ivy*, 119 Wis. 2d 591, 610, 350 N.W.2d 622 (1984).

¶20    To convict Jones of first-degree sexual assault of a child under the age of thirteen years, the State needed to prove beyond a reasonable doubt that: (1) Jones had sexual contact with Devin;[4] and (2) Devin was under thirteen years old at the time of the alleged sexual contact. *See* WIS. STAT. § 948.02(1)(e), *see also* WIS JI—CRIMINAL 2102E (2015). Jones does not dispute that Devin was under thirteen years old in November 2016. Instead, he argues that there was insufficient evidence for the circuit court to conclude beyond a reasonable doubt that he had sexual contact with Devin.

¶21    Viewing the evidence in the light most favorable to the State and the conviction, we disagree. Devin consistently stated, to his mother, in his forensic interview, and during his trial testimony, that "Brian" touched his penis. He described the touching in a reasonable manner, stating that Brian squeezed his penis and that Brian "chopped it like a lobster." Devin also consistently recounted that the touching occurred when he was at his uncle's home, while his father and uncle were away, and while he and Brian were watching television. Using an anatomical drawing of a male child, Devin circled the penile area of the child to indicate where Brian had touched him. The circuit court could thus reasonably find that someone named "Brian" had sexual contact with Devin.

---

[4] As relevant to this case, the State could prove that Jones had "sexual contact" with Devin by demonstrating that Jones intentionally touched one of Devin's intimate parts, whether directly or through clothing, for the purpose of sexually arousing or gratifying himself or sexually degrading or sexually humiliating Devin. *See* WIS. STAT. § 948.01(5)(a)1.

¶22 The circuit court could also reasonably find that Jones was the same person as the "Brian" who had sexual contact with Devin. Daniel and Craig knew Jones colloquially as "Brian." Jones also acknowledged during his testimony that he was first introduced to Devin as Brian and that he told Devin his name was Brian on the day Devin reported the sexual contact. It was also undisputed among the testifying witnesses that Jones was the only adult male in the home when Craig and Daniel left during the afternoon of November 20, 2016. Finally, Devin testified that Brian was an adult male with dark skin, which corresponds with a basic description of Jones.

¶23 Jones argues that insufficient evidence existed that he had sexual contact with Devin because (1) Devin failed to identify him as "Brian" at trial, (2) Devin did not adequately describe Jones in Devin's forensic interview, and (3) Jones and Maria denied that Jones touched Devin. In addition, Jones argues that the circuit court improperly speculated as to why Devin failed to identify Jones as the offender.

¶24 Devin's failure to point to Jones at trial and any discrepancy in his description of Brian during his forensic interview are not dispositive. Nor is Jones's and Maria's testimony that Jones never touched Devin. The trier of fact, not this court, must fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See State v. Fettig*, 172 Wis. 2d 428, 448, 493 N.W.2d 254 (Ct. App. 1992). In concluding that Jones was the person who had sexual contact with Devin, the circuit court properly weighed the evidence, including Devin's testimony that Brian was not in the courtroom, Devin's description of Brian in his forensic interview, and testimony from Jones and Maria that Jones never touched Devin.

¶25    The circuit court reasonably gave less weight to Devin's inability to identify Jones at trial, noting several plausible explanations for why Devin did not recognize Jones. Among other reasons, the court found plausible that Jones's appearance had changed since the sexual contact. Such explanation is not "speculation" or contrary to the evidence presented. Daniel testified that "[Jones's] hair was way longer" in November 2016 than at trial and that "he had way more beard, all scruffy looking …." In addition, Devin testified that at the time Brian touched his penis, Brian was wearing a shirt and shorts, and was not wearing glasses. As the court noted, however, Jones was wearing an orange suit and glasses at trial. The court also reasonably weighed Devin's ability to accurately describe Jones. The court recognized that Devin was a five-year-old child at the time of the assault and that it would not expect that a child could "describe a person to the T …."

¶26    Moreover, the circuit court reasonably gave less weight to Jones's and Maria's testimony. As the court recognized, both Jones and Maria had bias and a potential motive to lie because Jones had "a lot at stake" and Maria "doesn't want to see anything happen to Mr. Jones." The court also reasonably found Maria's testimony unrealistic that she watched Jones and talked to him the entire time Craig and Daniel were away for a couple of hours. The court noted that Maria was not in the same room as Devin and Jones, and that the touching only took about one minute.

¶27    Finally, considering Devin's testimony at trial and his statements to others, the circuit court recognized that the only person identified as touching Devin was "Brian" and "the only Brian is Mr. Jones." The court believed that someone had indeed touched Devin's penis, recognizing that Devin did not appear to have any motive to lie and did not make inconsistent statements or add to his

story. The court also believed that Devin reasonably described a painful pinch as being "[chopped] like a lobster." Based on Devin's consistent identification of the offender as "Brian" and the circumstantial evidence that Jones was present and was the only person known as "Brian" in the home, the court could reasonably conclude that "[Devin] identified the defendant, he identified him as Brian."

¶28 The circuit court reasonably gave greater weight to the evidence that Jones was the offender than to Devin's testimony that "Brian" was not in the courtroom and Jones's and Maria's testimony that Jones did not touch Devin. Thus, viewing the evidence in the light most favorable to the State and the conviction, sufficient evidence existed for the court to find Jones guilty of the charged crime.

## II. Extraneous information

¶29 Jones also argues that the circuit court improperly relied on extraneous information to reach its verdict. Verdicts must either be based on the evidence properly admitted at the trial, or matters for which judicial notice may be taken. *State v. Sarnowski*, 2005 WI App 48, ¶12, 280 Wis. 2d 243, 694 N.W.2d 498. A circuit court sitting as fact finder "may derive inferences from the testimony and take judicial notice of a fact that is not subject to reasonable dispute, but it may not establish as an adjudicative fact that which is known to the judge as an individual." *State v. Peterson*, 222 Wis. 2d 449, 457, 588 N.W.2d 84 (Ct. App. 1998).

¶30 Jones first contends that the circuit court improperly considered Devin's nightmares as evidence of sexual abuse without any supporting expert

testimony regarding post-assault behavior of sexual abuse victims—i.e., *Jensen* evidence.[5] Jones further argues that because the State did not introduce *Jensen* evidence, the court improperly relied on evidence not admitted at trial. The State concedes that the court improperly relied on evidence not admitted at trial regarding sexual abuse victims suffering nightmares.

¶31 We agree with the parties that the circuit court improperly relied on evidence not admitted at trial regarding sexual abuse victims experiencing nightmares and behavioral changes. In rendering its verdict, the court recognized that nightmares and behavioral changes are consistent with someone who has been sexually assaulted:

> She said that after this incident happened he was a happy kid, but he's becoming a little bit more withdrawn, he's kind of changed a little bit.
>
> He's having nightmares and based on the Court's own experience that's something that the Court has to consider. That's consistent with someone who's been sexually assaulted. Doesn't necessarily mean that they have been, but for a child to have a change in behavior, to have nightmares is based upon the Court's experience is consistent.

¶32 In certain cases, expert testimony may be presented to explain whether behavior is consistent with post-assault behavior of sexual abuse victims. *See State v. Jensen*, 147 Wis. 2d 240, 256, 432 N.W.2d 913 (1988). No evidence, however, was introduced in this case regarding sexual abuse victims suffering from post-assault nightmares or changes in behavior. Nor did the State present any expert testimony regarding whether Devin's nightmares and behavioral

---

[5] *See State v. Jensen*, 147 Wis. 2d 240, 432 N.W.2d 913 (1988).

changes were consistent with a victim of sexual abuse. Instead, the circuit court relied on its own experience. During postconviction proceedings, the court described its experience as having "tried numerous sexual assault cases and [having] heard from experts and [having] seen people who have nightmares who were sexually assaulted."

¶33 The circuit court did not take judicial notice of the prevalence of nightmares among sexual abuse victims, but rather relied on its experience, which included having heard from experts in prior cases. No expert, however, testified at Jones's trial that nightmares and behavioral changes are consistent with the behavior of victims of sexual abuse. Furthermore, although the court may have had some knowledge regarding the prevalence of nightmares among sexual abuse victims and their changes in behavior, such knowledge is not within the "common knowledge" of a layperson. The court therefore erred in relying on facts known to the judge as an individual instead of relying on evidence properly admitted at trial. *See* ***Peterson***, 222 Wis. 2d at 457.

¶34 The State nevertheless argues that such error was harmless. A circuit court's consideration of extraneous information in rendering a verdict is subject to harmless error analysis.[6] *Cf.* ***State v. Eison***, 194 Wis. 2d 160, 177-78,

---

[6] Jones questions whether harmless error analysis applies under these circumstances. He argues that the proper standard is whether the judge improperly used her or his experience "as a basis for her [or his] decision on the critical issue [in the case]." *See* ***State v. Sarnowski***, 2005 WI App 48, ¶16, 280 Wis. 2d 243, 694 N.W.2d 498. We reject this argument.

(continued)

14

533 N.W.2d 738 (1995) (applying harmless error analysis to extraneous information that was improperly brought to a jury's attention); *State v. Poh*, 116 Wis. 2d 510, 524-33, 343 N.W.2d 108 (1984). For an error to be harmless, the party that benefited from the error must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *State v. Hunt*, 2014 WI 102, ¶26, 360 Wis. 2d 576, 851 N.W.2d 434. In other words, it must be clear beyond a reasonable doubt that a rational fact finder would have found the defendant guilty absent the error. *Id.* To determine whether the extraneous information was harmless, we consider factors such as: (1) the nature of the extraneous information; (2) the circumstances under which it was brought to the fact finder's attention; (3) the nature and character of the State's case and the defense presented at trial; and (4) the connection between the extraneous information and a material issue in the case. *See Eison*, 194 Wis. 2d at 179 (citing *Poh*, 116 Wis. 2d at 530).

¶35 The nature of the extraneous information was the circuit court's own knowledge of how sexual abuse victims experience nightmares and changes in behavior. The court, under its own volition, incorporated this extraneous information into its analysis and ultimate decision. Although Demi testified to Devin's nightmares and his changes in behavior, there was no factual basis in the

---

The *Sarnowski* court never considered whether a circuit court's reliance on extraneous information could be subject to harmless error analysis. *See id.* Moreover, in arguing that harmless error analysis does not apply, Jones essentially argues that a circuit court's reliance on extraneous information is structural error requiring automatic reversal. *See State v. C.L.K.*, 2019 WI 14, ¶¶13-14, 385 Wis. 2d 418, 922 N.W.2d 807. Structural errors, however, "either affect[] the entire proceeding, or affect[] it in an unquantifiable way." *Id.*, ¶15. Here, the error complained of only involved a part of the circuit court's decision-making process. The error also did not affect the trial in an unquantifiable way because the court's oral decision allows this court to consider the error in the context of the circuit court's broader thought process.

record for the court to conclude that such behavior was "consistent with someone who's been sexually assaulted."

¶36 In a case that largely turned on the credibility of witnesses, the extraneous information served to further bolster Devin's credibility and impeach Jones's credibility. The State contends that the circuit court found Devin credible for multiple reasons, including his consistent recollection of what happened, the absence of any reason to lie, and the lack of evidence that Devin was coached. We agree that the court found Devin credible for those reasons, but such factors were not the only considerations in determining his credibility. Devin's credibility and his ability to recall people and events were called into question when he twice denied that "Brian" was in the courtroom. Indeed, the court found it concerning that Devin "did not identify Mr. Jones at trial." Because Devin's credibility was called into question, corroborating evidence of sexual contact, such as the extraneous information at issue here, may have contributed to the court finding Devin credible.

¶37 The extraneous information also had a strong connection to a material issue in this case—i.e., whether someone had sexual contact with Devin. The circuit court believed that someone had sexual contact with Devin, in part, because Devin had nightmares and behavioral changes after the alleged sexual assault, which the court found to be consistent with behaviors exhibited by other victims of sexual assault. The State attempts to downplay the importance of that extraneous information by emphasizing the court's recognition that nightmares and behavioral changes do not necessarily mean that a sexual assault has occurred. That qualifying statement, however, does not remove the fact that the court believed Devin's nightmares and behavioral changes were consistent with behaviors of sexual assault victims, and supported the court's finding of guilt. The

court also acknowledged during a postconviction proceeding that Devin's nightmares "[were] significant."

¶38   Finally, Devin not identifying Jones as "Brian" in the courtroom exposed that the State's case had some weaknesses.   Devin also previously described Brian during his forensic interview as having "tall" black hair, but no one else at trial described Brian as having anything other than "long" hair. Finally, Jones testified that he did not touch Devin, and the circuit court found that Jones "seemed pretty credible."

¶39   Under the facts presented here, the State has failed to demonstrate that the circuit court's improper consideration of extraneous information was harmless.   The State's case had notable weaknesses, and the extraneous information had a strong connection to material issues in the case.   We therefore cannot conclude beyond a reasonable doubt that the court would have reached the same verdict had it not relied on its own knowledge that Devin's nightmares and behavioral changes were consistent with behaviors exhibited by child victims of sexual abuse.

¶40   Jones also argues that the circuit court improperly conducted legal research and relied on that research when reaching its verdict.   He contends, without citation to legal authority, that a bench-trial judge, like a jury, cannot research the law.   The State does not refute Jones's arguments that the court erred by conducting its own legal research, but it instead argues that any error was harmless.

¶41   As an initial matter, we disagree with Jones that the circuit court's legal research constituted extraneous information that the court could not consider. The court did not establish any adjudicative facts from its legal research.   Rather,

it consulted legal authority that provided guidance on whether the court was required to acquit Jones because Devin failed to identify Jones at trial. In recognizing that this issue was not dispositive, the court—relying on evidence properly admitted at trial—concluded that plausible explanations existed for why Devin failed to point to Jones at trial and that Devin properly identified Jones when he consistently reported that Brian was the person who had touched him.

¶42    Even assuming that the circuit court improperly conducted, and relied upon, its own legal research, such error was harmless. The court recognized in its decision denying postconviction relief that it "had already concluded that the incident happened and the defendant was responsible" before conducting its own legal research. Jones contends that "[i]f the court was still questioning whether the State had met its burden of proof, it had not yet reached its verdict." The record belies Jones's contention. Having already concluded that the State met its burden, the court researched whether, despite the evidence, any case law required that Jones be acquitted due to the lack of direct identification at trial. We therefore conclude, beyond a reasonable doubt, that the court would have found Jones guilty absent any error in researching case law.[7]

¶43    In conclusion, sufficient evidence supported the circuit court's finding that Jones had sexual contact with Devin, and we therefore affirm the court's denial of postconviction relief in that regard. We conclude, however, that

---

[7] Jones argues that the circuit court did not identify citations to the cases that it considered, aside from *State v. David J.K.*, 190 Wis. 2d 726, 528 N.W.2d 434 (Ct. App. 1994). Be that as it may, the consideration of other cases does not alter our conclusion here. The court did not rely on any cases to establish adjudicative facts, and it had already found Jones guilty before researching whether lack of direct identification at trial required acquittal as a matter of law.

the court improperly relied on its own knowledge of sexual abuse victims experiencing nightmares and behavioral changes to convict Jones and that such error was not harmless. We therefore reverse the judgment of conviction and the order denying relief, and we remand for a new trial. Finally, the court did not improperly conduct its own legal research, but even if it did, such error was harmless beyond a reasonable doubt.

*By the Court.*—Judgment reversed; orders affirmed in part and reversed in part; cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.