# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP1413 & 2017AP1414 |
| COMPLETE TITLE: | In re the termination of parental rights to S.M.H., a person under the age of 17: |

State of Wisconsin,
          Petitioner-Respondent,
     v.
C. L. K.,
          Respondent-Appellant-Petitioner.
---------------------------------------------------
In re the termination of parental rights to J.E.H., a person under the age of 17:

State of Wisconsin,
          Petitioner-Respondent,
     v.
C. L. K.,
          Respondent-Appellant-Petitioner.

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 378 Wis. 2d 742, 905 N.W.2d 845
(2017 – unpublished)

| | |
|---|---|
| OPINION FILED: | February 19, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 24, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Christopher R. Foley |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ROGGENSACK, C.J. dissents, joined by ZIEGLER, J. (opinion filed) |
| NOT PARTICIPATING: | DALLET, J. did not participate. |

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by *Jeffrey W. Jensen* and *Law Offices of Jeffrey W. Jensen.* There was an oral argument by *Jeffrey W. Jensen*.

For the petitioner-respondent, there was a brief filed by *Matthew Westphal*, assistant district attorney, with whom on the brief was *John T. Chisholm*, district attorney. There was an oral argument by *Matthew Westphal*.

A guardian ad litem brief was filed by *Michael S. Holzman* and *Rosen and Holzman Ltd.*, Waukesha.

Nos. 2017AP1413 & 2017AP1414
(L.C. Nos. 2016TP302 & 2016TP303)

STATE OF WISCONSIN : IN SUPREME COURT

**In re the termination of parental rights to
S.M.H., a person under the age of 17:**

**FILED**

**FEB 19, 2019**

Sheila T. Reiff
Clerk of Supreme Court

NOTICE

**This opinion is subject to further
editing and modification. The final
version will appear in the bound
volume of the official reports.**

**State of Wisconsin,**

      **Petitioner-Respondent,**

    **v.**

**C. L. K.,**

      **Respondent-Appellant-Petitioner.**

---

**In re the termination of parental rights to
J.E.H., a person under the age of 17:**

**State of Wisconsin,**

      **Petitioner-Respondent,**

    **v.**

**C. L. K.,**

      **Respondent-Appellant-Petitioner.**

---

REVIEW of a decision of the Court of Appeals. *Reversed and remanded.*

¶1 DANIEL KELLY, J. The State of Wisconsin petitioned the Milwaukee County Circuit Court to terminate C.L.K.'s parental rights, following which the matter went to trial in due course.[1] After the State rested, the circuit court immediately decided that Mr. K. was an unfit parent. That is, the circuit court decided the matter before giving Mr. K. an opportunity to present his case. The State concedes this was error, but says it is susceptible to a "harmless-error" review. It is not. We hold that denying a defendant the opportunity to present his case-in-chief is a structural error, the consequence of which is an automatic new trial.

## I. BACKGROUND

¶2 The State petitioned the Milwaukee County Circuit Court to terminate Mr. K.'s parental rights with respect to his two children, S.M.H. and J.E.H.[2] The State's petition alleged that Mr. K.: (1) abandoned his children, within the meaning of

---

[1] This is a review of an unpublished decision of the court of appeals, State v. C.L.K., Nos. 17AP1413 & 17AP1414, unpublished slip op. (Wis. Ct. App. Oct. 10, 2017), affirming the orders of the Milwaukee County Circuit Court, the Honorable Christopher R. Foley presiding.

[2] The State's petitions also sought to terminate the parental rights of E.A.S., the children's mother. Ms. S. did not contest the petition and voluntarily relinquished her parental rights to the children.

Wis. Stat. § 48.415(1)(a)2 (2015-16);[3] and (2) failed to assume parental responsibility, within the meaning of § 48.415(6). Mr. K. contested these allegations, and so the matter proceeded to a bench trial after Mr. K. waived his right to a jury.

¶3   When the State wishes to terminate a parent's rights, it must follow a statutorily-mandated, two-phase trial procedure.[4]   The first is the "grounds" phase, the purpose of which is to determine "if the allegations in a . . . petition to terminate parental rights are proved by clear and convincing evidence."   Wis. Stat. § 48.31(1).   The result of this first phase is a determination regarding the parent's fitness:  "If grounds for the termination of parental rights are found by the court or jury, the court shall find the parent unfit."   Wis. Stat. § 48.424(4).   If the parent is found unfit, then (and only then) may the court proceed to the dispositional phase.   During this phase of the proceedings "the court is called upon to decide whether it is in the best interest of the child that the parent's rights be permanently extinguished."   Steven V. v. Kelley H., 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856; see also Wis. Stat. § 48.426(2).   Although the parent may still participate in the disposition phase (through the presentation of evidence and argument), the circuit court does not revisit

_____

[3] All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

[4] Steven V. v. Kelley H., 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856 ("Wisconsin has a two-part statutory procedure for the involuntary termination of parental rights.").

the finding of parental unfitness. See Wis. Stat. § 48.427(1) ("Any party may present evidence relevant to the issue of disposition . . . ."); Evelyn C.R. v. Tykila S., 2001 WI 110, ¶23, 246 Wis. 2d 1, 629 N.W.2d 768 ("The parent has the right to present evidence and be heard at the dispositional phase."); Sheboygan Cty. DHHS v. Julie A.B., 2002 WI 95, ¶37, 255 Wis. 2d 170, 648 N.W.2d 402 ("Once a basis for termination has been found by the jury and confirmed with a finding of unfitness by the court, the court must move to the second-step, the dispositional hearing . . . ."); see also § 48.424(4) (Upon finding grounds to terminate parental rights, the court shall find the parent unfit and "proceed immediately to hear evidence and motions related to the dispositions . . . .").

¶4 This case involves only the "grounds" phase of the trial, at which the State called Mr. K. as its sole witness. Mr. K. testified that he had not seen his children "for a couple of months" and wasn't involved in their lives. He testified that he didn't visit his children, speak to them, write to them, text them, or contact their foster home from July 2015 to September 2016. When the State asked Mr. K. why he didn't contact his children, Mr. K. stated he didn't have a phone and that a social worker told him he couldn't contact the foster home. Mr. K. admits that he didn't make any effort to contact his children and was hardly involved in their lives for three years. When pressed as to whether he had a good reason for not

4

contacting them, he said: "There's no reason at all. There's no excuse."[5]

¶5 On cross-examination by his own attorney, Mr. K. reiterated that a social worker told him that he wasn't permitted to contact his children or allowed to have the foster home's phone number. Mr. K.'s attorney didn't explore any other aspects of Mr. K.'s direct testimony.

¶6 On redirect, Mr. K. again admitted that he took no steps to contact his children and that he did not make any inquiries about how or if he could contact them. The circuit court itself asked Mr. K. to relate what the social worker told him. "[S]he told me that she wasn't allowed to give me any information on [my children,]" he said. The circuit court also asked him why he chose not to visit his children even though he had visitation rights. Mr. K. said he moved out of town in July 2015 for a better job and was unable to visit his children.

¶7 The guardian ad litem renewed his examination, asking Mr. K. whether anything prevented him from visiting his children. Mr. K. said that other than being out of town, nothing prevented him from exercising his visitation rights. Mr. K's testimony ended with his attorney asking him about the contact information Mr. K. gave to the social worker.

¶8 The State rested the "grounds" phase of its case at the conclusion of Mr. K.'s testimony. After some discussion

---

[5] The guardian ad litem's questioning elicited similar testimony.

5

amongst the parties and the circuit court about the next procedural step in the case, Mr. K.'s attorney asked that he be allowed to "put my client on the stand and finish our side of the case."  Before he could do so, however, the guardian ad litem moved the circuit court for a directed verdict arguing that the State had proved adequate grounds for terminating Mr. K.'s parental rights.

¶9   Even though Mr. K. had not yet put on his case, the circuit court granted the motion.  It decided that, even when viewing the evidence in the light most favorable to Mr. K., he had abandoned S.M.H. and J.E.H. within the meaning of Wis. Stat. § 48.415(a)2.[6]  After finding Mr. K. to be an unfit parent, the circuit court proceeded later that same day to the "disposition" phase of the trial to determine the children's best interests. At its conclusion, the circuit court permanently terminated Mr. K.'s parental rights to both his children.

¶10  Mr. K. appealed.[7]  He argued that deciding whether he was an unfit parent before he could present his case violated his due process rights.  Further, and more significantly for our purposes here, Mr. K. said this was no run-of-the-mill error, it

---

[6] Because it found sufficient grounds for termination based on abandonment, the circuit court chose not to address the State's second allegation——that Mr. K. failed to assume parental responsibility within the meaning of Wis. Stat. § 48.415(6).

[7] On August 9, 2017, the court of appeals consolidated the two orders terminating Mr. K.'s parental rights and considered both of them in a single appeal.

was structural error, the consequence of which is a mandatory reversal. The State admitted error (it could hardly do otherwise), but maintained the circuit court's decision was subject to a "harmless-error" review.

¶11 The court of appeals agreed with the State. The court of appeals said the evidentiary record (to which Mr. K. was unable to contribute except through the State's adverse examination and his own counsel's cross-examination) overwhelmingly established grounds for termination. So the error, it concluded, was harmless. We granted Mr. K.'s petition for review.

## II. STANDARD OF REVIEW

¶12 The issue we consider here presents a question of law: "Whether a particular error is structural and therefore not subject to a harmless error review is a question of law for our independent review." State v. Nelson, 2014 WI 70, ¶18, 355 Wis. 2d 722, 849 N.W.2d 317 (citing State v. Travis, 2013 WI 38, ¶9, 347 Wis. 2d 142, 832 N.W.2d 491.). Thus, our review is de novo.

## III. DISCUSSION

¶13 The parties agree the circuit court erred when it decided he was an unfit parent before he had an opportunity to present his defense. But they go their separate ways with respect to whether this error was "structural," as opposed to something subject to "harmless-error" review. Travis, 347 Wis. 2d 142, ¶55 ("Constitutional errors may be structural errors or may be subject to harmless error analysis."). The

7

difference is important because the former category requires an automatic reversal, while the latter allows the circuit court's judgment to stand so long as there is no consequential injury to the defendant's case.

¶14 The United States Supreme Court provides the rubric we use in categorizing trial errors. The potentially harmless ones, it says, are those that "occur[] during presentation of the case to the jury and their effect may be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt." United States v. Gonzales-Lopez, 548 U.S. 140, 148 (2006) (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)) (internal marks omitted). Only a very limited number of errors "require automatic reversal," because "most constitutional errors can be harmless . . . ." Nelson, 355 Wis. 2d 722, ¶29 (quoting Fulminante, 499 U.S. at 306) (internal marks omitted). In fact, "there is a strong presumption that any . . . errors that may have occurred are subject to harmless-error analysis." Neder v. United States, 527 U.S. 1, 8 (1999) (quoting Rose v. Clark, 478 U.S. 570, 579 (1986)).

¶15 A "structural error," on the other hand, is not discrete. It is something that either affects the entire proceeding, or affects it in an unquantifiable way:

> Structural errors are different from regular trial errors because they "are structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." Structural defects affect "[t]he entire conduct of the trial from beginning to end." An error also may be structural

8

because of the difficulty of determining how the error affected the trial.

State v. Pinno, 2014 WI 74, ¶49, 356 Wis. 2d 106, 850 N.W.2d 207 (quoted source omitted); see also Weaver v. Massachusetts, 137 S. Ct. 1899, 1907 (2017) ("The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial.").[8]  So we recognize a structural error by how it "affect[s] the framework within which the trial proceeds, rather than being simply an error in the trial process itself." Id. at 1907 (quoting Fulminante, 499 U.S. at 310) (internal marks omitted).  That is to say, structural errors "permeate the entire process." Nelson, 355 Wis. 2d 722, ¶34.[9]  Upon encountering structural error, we must reverse. Neder, 527

---

[8] A defendant's constitutionally-protected right to due process applies here just as much as it does in the criminal context:  "The due process protections of the 14th Amendment apply in termination of parental rights cases.  When the State seeks to terminate familial bonds, it must provide a fair procedure to the parents, even when the parents have been derelict in their parental duties." Brown Cty. v. Shannon R., 2005 WI 160, ¶56, 286 Wis. 2d 278, 706 N.W.2d 269.  See also id., ¶59 ("Although they are civil proceedings, termination of parental rights proceedings deserve heightened protections because they implicate a parent's fundamental liberty interest.").

[9] Structural errors include (but are not limited to) denying the defendant the right to counsel, the right to counsel of his choice, the right to self-representation, the right to an impartial judge, the right to a jury selected without reference to race, and the right to a public trial. See State v. Nelson, 2014 WI 70, ¶34, 355 Wis. 2d 722, 849 N.W.2d 317 (citations omitted); State v. Pinno, 2014 WI 74, ¶50, 356 Wis. 2d 106, 850 N.W.2d 207.

U.S. 1, 7 (1999) ("Errors of this type are so intrinsically harmful as to require automatic reversal (i.e., 'affect substantial rights') without regard to their effect on the outcome.").[10]

¶16 For the reasons we discuss below, we conclude that a proceeding in which a court decides a disputed matter in favor of the State, before allowing the respondent the option of presenting his case-in-chief, adversely affects the very framework within which the trial is supposed to take place.

_____

[10] The dissent says the United States Supreme Court recently clarified that "a new trial does not automatically follow from a determination that a trial error was structural." Dissent, ¶72 (citing Weaver v. Massachusetts, 137 S. Ct. 1899, 1910 (2017)). But Weaver addresses the structural error doctrine only in the context of an ineffective assistance of counsel claim. Id. at 1911 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). Because of that posture, the Weaver court had to harmonize: (1) Strickland's holding that there is no Sixth Amendment violation unless counsel's error prejudiced the defense; with (2) the "structural error" doctrine's provision that reversal is the appropriate remedy without a showing of prejudice.

However, when the defendant presents the structural error on direct appeal, as he did here, Weaver reaffirms Neder's prescription that the remedy is an automatic reversal. See Weaver, 137 S. Ct. at 1910 (citing Neder v. United States, 527 U.S. 1, 8 (1999)). The very quote upon which the dissent relies says so: "'[S]tructural error' carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.'" Dissent, ¶72 (quoting Weaver, 137 S. Ct. at 1910). There is only one thing a court may do when the State may not prove an error's harmlessness: Reverse the judgment encompassing the error. So Weaver does not support the proposition for which the dissent cites it.

Consequently, the error so permeates the proceeding that it is incapable of producing a constitutionally-sound result. The error is, therefore, structural.

¶17 One of our most familiar constitutional guarantees is that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. Part of the process due to every citizen is "the opportunity to be heard," which must occur "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552 (1965) (citation and internal marks omitted). This guarantee is foundational: "The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoted source omitted).

¶18 The primary mechanism by which we hear litigants' disputes is through the adversarial process. "The Constitution requires (unless the defendant waives his rights) a certain modicum of adversary procedure even if the outcome is a foregone conclusion . . . ." Oswald v. Bertrand, 374 F.3d 475, 482 (7th Cir. 2004) (quoting Walberg v. Israel, 766 F.2d 1071, 1074 (7th Cir. 1985)). That is why "litigants must be given their day in court. Access to the courts is an essential ingredient of the constitutional guarantee of due process." Piper v. Popp, 167 Wis. 2d 633, 644, 482 N.W.2d 353 (1992).

¶19 The value of having one's day in court, however, depends entirely on what the defendant may do with it: "The

11

opportunity to be heard includes the right to 'present a complete defense.'"  Brown Cty. v. Shannon R., 2005 WI 160, ¶65, 286 Wis. 2d 278, 706 N.W.2d 269 (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)).  That means our inquiry must here become more pointed, more focused.  We must determine whether a proceeding in which the defendant is not afforded an opportunity to present his case may be fairly characterized as a "trial" capable of satisfying the demands of Mathews and Piper.

¶20 Our history, and English history too, teach us that one of the oldest and most constant features of a trial is the adversarial presentation of a case.  That is, a trial is a procedurally balanced proceeding in which the parties face no disparate structural barriers in presenting their respective cases to the decision-maker.  Although its precise origins are unknown, the adversarial trial took root in England shortly after the Norman conquest of 1066.  Ellen E. Sward, The History of the Civil Trial in the United States, 51 Kan. L. Rev. 347, 354 (2003) (citing James Bradley Thayer, A Preliminary Treatise on Evidence at the Common Law, 54-67 (Rothman Reprints 1969) (1898)).  The trial mechanism evolved over time, but manifested many of its modern characteristics as early as the late-fifteenth century.  Some accounts, dating back to 1468, describe a trial as a proceeding in which "the parties or their counsel in open court present their evidence to the jury, and witnesses are examined upon oath."  Theodore F.T. Plucknett, A Concise History of Common Law, 129-30 (Little, Brown & Co. 5th Ed. 1956) (citation omitted).

12

¶21 Today, Sir William Blackstone's eighteenth-century description of a proper trial is readily familiar:

> The nature of the case, and the evidence intended to be produced, are next laid before [the jury] by counsel also on the [opening] side; and, when their evidence is gone through, the advocate on the other side opens the adverse case, and supports it by evidence; and then the party which began is heard by way of reply.

3 William Blackstone, Commentaries on the Laws of England ch. 23, at 367 (Richard Couch, London 21st ed. 1844) (1768). Commentators since then have consistently described trials as embodying this mutuality of opportunity. See, e.g., Robert W. Millar, The Formative Principles of Civil Procedure, 18 Ill. L. Rev. 1, 4 (1923) ("Most obvious . . . of the conceptions in question is the idea that both parties must be heard . . . ."); Henry John Stephen, A Treatise on the Principles of Pleading in Civil Actions 58 (3d Am. ed. Washington, D.C.: W.H. Morrison 1882) ("The appearance of the parties . . . in open court . . . was requisite. Upon such appearance followed the allegations of fact, mutually made on either side, by which the court received information of the nature of the controversy.") (Original emphasis omitted and emphasis added.); Stephan Landsman A Brief Survey of the Development of the Adversarial System, 44 Ohio St. L.J. 713, 714 (1983) ("[T]he key element[] in the system . . . [was] reliance on party presentation of evidence . . . ."); Ellen E. Sward, Values, Ideology, and the Evolution of the Adversary System 64 Ind. L. Rev. 301, 312 (1989) ("[T]he parties themselves are

responsible for gathering and presenting evidence and arguments on behalf of their positions."); Sward, supra, at 302 ("The adversary system is characterized by party . . . presentation of evidence and argument, and by a passive decision-maker who merely listens to both sides . . . .").

¶22 Our history teaches us that one of the essential attributes of an adversarial trial is the mutuality of the parties' opportunity to present their cases. The defendant may choose to forgo his presentation, of course, but without the option of going forward we cannot dignify the proceeding with the appellation "trial." Such a proceeding is structurally unbalanced because the defendant faces an impediment to presenting his case that the State does not. Here, for example, the State had the option of choosing who would testify, the order in which it would present its witnesses, and the information it would adduce from each witness. It is of no constitutional moment that the State's case consisted solely of Mr. K.'s testimony. The relevant fact is that the State enjoyed the liberty of choosing the parameters of its case.

¶23 Mr. K. enjoyed no such liberty. In the "grounds" phase of the trial, the circuit court did not allow him to decide who his witnesses would be, the order in which they would testify, or the evidence he would seek from each one. By denying to Mr. K. the same opportunity allowed to the State, the circuit court required that he present his case only in response to the prosecutor's questions and within the constraints of his attorney's cross-examination. Mr. K.'s attorney obviously

14

believed there was more to the defense than he was able to squeeze into the interstices of the State's case. After the State rested, he asked "to be able to put my client on the stand and finish our side of the case." The record does not reflect with certainty whether "finishing" the case would have involved additional witnesses.[11] But it does show that his attorney thought there was more to Mr. K.'s defense and that he was not waiving his right to present it.[12]

¶24 The State says the circuit court's error was of the same general nature as those we have previously assayed for harmlessness. It points out that in Nelson, for example, we observed that "[a] criminal defendant has a personal, fundamental right to testify and present his own version of events in his own words." 355 Wis. 2d 722, ¶19 (internal marks

---

[11] The dissent purports to find conclusive evidence that Mr. K. would have had no other witness than himself in the "grounds" phase of the trial. Dissent, ¶84 n.12. That conclusion, however, depends on the dissent's assumption that the witnesses in the "disposition" phase of the trial will necessarily be the same as those in the "grounds" phase. Because the different phases address different questions, the assumption is unsound.

[12] The breadth of cross-examination allowable under Wisconsin's procedural rules does not affect this analysis. See Wis. Stat. § 906.11(2) ("A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. In the interests of justice, the judge may limit cross-examination with respect to matters not testified to on direct examination."). Although the circuit court could have limited Mr. K's testimony to matters educed by the State, there is no indication it did. Nonetheless, the comments of Mr. K.'s attorney demonstrate that, in anticipation of putting on his own case, he did not introduce all of his evidence through cross-examination.

15

omitted). Nonetheless, we said that "[a]n error denying the defendant . . . the right to testify on his or her own behalf bears the hallmark of a trial error." Id., ¶32. We concluded, therefore, that this error's effect "on the jury's verdict can be 'quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.'" Id. (quoting Fulminante, 499 U.S. at 308.). The State also cites State v. Kramer for the proposition that "a violation of the right to present a defense is subject to harmless error analysis." 2006 WI App 133, ¶26, 294 Wis. 2d 780, 720 N.W.2d 459 (citing Crane v. Kentucky, 476 U.S. 683, 691 (1986)). But Kramer's statement is considerably more ambitious than its holding. Mr. Kramer actually did present a defense; the circuit court simply excluded the testimony of one of his witnesses. Id., ¶21. Nelson and Kramer, therefore, both stand for the proposition that exclusion of a witness's testimony, whether that of the defendant (Nelson) or of another (Kramer), is subject to harmless-error review. The United States Supreme Court came to a similar conclusion after considering a defendant's claim that his trial was defective because the trial court excluded evidence that could have cast doubt on the credibility of his confession. The Court said that, "[i]n the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" Crane, 476 U.S. at 690-91 (quoted source omitted).

16

However, both the parties and the Court agreed that this deprivation was subject to a harmless-error review. Id. at 691.

¶25 The State says the circuit court's error in this case is of a piece with Nelson, Kramer, and Crane. They may not all share the same spot on the continuum between harmlessness and harmfulness, it suggests, but they nonetheless all exist on that continuum. The difference, it argues, is one of magnitude, not type. Conceptually, excluding a single piece of evidence is a fractional denial of the defendant's opportunity to put on his case. So, if excluding a fractional part of the defendant's case is subject to harmless-error review (as the State asserts), it follows that excluding the whole would be subject to the same test.

¶26 The State's observation is accurate, as far as it goes. But it does not go far enough. If a trial were a two-dimensional affair, the State's argument would be more persuasive. If a case were merely a compilation of individual facts, then the difference between excluding one piece of the defendant's evidence and excluding the entirety of the defendant's case is just a question of quantity. But a trial is not a formless jumble of evidence dumped in the factfinder's lap, nor does the factfinder adjudge a party's success by the size of the heap. A trial is, instead, an exhibition of evidence presented within an intentionally-ordered construct designed to produce an intelligible and persuasive account of the matter sub judice. It is, in that sense, three-dimensional,

17

all components of which combine to produce depth, emphasis, cohesion, and——ultimately——understanding.

¶27 So a trial is not just a contest between competing facts; it is a contest between the constructs in which they are presented, something practitioners call the "theory of the case." The competition between the theories of the case is what makes the trial adversarial, a dynamic that affects every aspect of the proceeding, including the type, nature, and extent of evidence a party may choose to elicit during the opposing party's case-in-chief. If defense counsel knew beforehand that the court would deny him the right to present his case, he might shoehorn as much of his presentation as possible into the State's case. That might solve the quantitative problem presented by the circuit court's error. But it could do very little, if anything, to preserve the defendant's ability to present his facts according to his theory of the case.

¶28 The error in this case did not affect just the quantity of evidence presented, such as in Nelson, Kramer, and Crane. It was, instead, an error affecting the adversarial nature of the trial. This matter was presented to the circuit court according to only the State's theory of the case. This lack of mutuality made the hearing less like an adversarial contest between the parties and more like a continental-European

inquisitorial proceeding.[13]  The State might be more likely to see the permeating flaw this introduces into the very framework of the trial if the defense controlled the sequence of the State's witnesses and their direct examination, or if the State could present its case only through the cross-examination of its own witnesses.

¶29 The harmless-error rubric is incapable of reaching an error that affects the framework of the trial.  By its own terms, it is designed to address errors whose effect "may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether [it was] harmless beyond a reasonable doubt."  Fulminante, 499 U.S. at 307-08 (emphasis added).  But there is no quantitative assessment that can measure the harm of a proceeding in which

---

[13] In contrast to our adversarial system, which relies on the parties——plural——to illuminate the case through their competing presentations, is the inquisitorial system, which emphasizes the judge's role in elucidating the facts.  See Mathew T. King, Security, Scale, Form, and Function: The Search for Truth and the Exclusion of Evidence in the Adversarial and Inquisitorial Justice Systems, 12 Int'l Legal Persp. 185, 218 (2001-2002) (The inquisitorial system "allocates most of its investigatory power in judges."); Abraham S. Goldstein, Reflections on Two Models: Inquisitorial Themes in American Criminal Procedure, 26 Stan. L. Rev. 1009, 1018 (1976) ("The judge dominates the proceeding and often appears to move relentlessly toward a predetermined result of conviction."). The inquisitorial system places "little emphasis on oral presentation of evidence or on cross-examination by [a party's] counsel." Goldstein, supra, at 1018-19.  "Instead, the trial is mainly a public recapitulation of written materials included in a dossier compiled earlier by an investigating magistrate." Id. at 1019.

only the State is allowed to present a theory of the case. As we noted in Nelson, we cannot review a circuit court's error for harmlessness if its effects are "inherently elusive [and] intangible . . . ." 355 Wis. 2d 722, ¶33 (quoting Palmer v. Hendricks, 592 F.3d 386, 399 (3d Cir. 2010)). We have no tools with which to winnow the ill effects of this type of error, which makes the harm suffered by Mr. K. inherently elusive and intangible, and therefore structural. See Pinno, 356 Wis. 2d 106, ¶49 ("An error also may be structural because of the difficulty of determining how the error affected the trial.").[14]

¶30 The dissent's spirited defense of this state-centric half-trial gets the order of the analysis the wrong way around. The proper order is first to determine whether the error is structural in nature. If it is not, then (and only then) we assay the error's harmlessness——that is to say, we consider whether it prejudiced the defense. The dissent, however, started with the second step. It conducted a minute examination of the record to assess the sufficiency of the evidence, reasoning that "[p]recedent and fundamental fairness to C.L.K.

---

[14] The dissent says our opinion "does not explain how the error so affected the trial that its effect could not be measured or that its burden continued from the start of the trial without relief to the end of the trial. Instead, ipse dixit, the majority opinion discovers a new type of structural error." Dissent, ¶80. This is a surprising statement, inasmuch as the preceding sixteen paragraphs are devoted to nothing but that explanation.

20

and to his two children require that we consider evidence presented at both the factfinding hearing and the dispositional hearing when determining the effect of the error." Dissent, ¶87. But the "effect on C.L.K." is what we consider when conducting the second step of the analysis. The first step (determining whether the error is structural) depends on the error's effect on the proceedings, not the prejudice to C.L.K.

¶31 This is why cases addressing structural error do not scrutinize the evidence presented at trial, as the dissent insists we must do. Dissent, ¶79. The two cases foundational to the structural error doctrine, Gonzalez-Lopez and Fulminante, illustrate this neatly. The issue in Gonzalez-Lopez was whether denying a defendant his right to counsel of his choice was a structural error. 548 U.S. at 150. He had gone through a complete trial, so there was an evidentiary record for the Court to consider if that had been relevant to the question. But in the course of reaching its decision, the Court completely ignored it. There is no mystery as to why——the evidence of record simply has nothing to say about whether an error is structural. Similarly, in Fulminante, the Court addressed whether coerced confessions qualified as structural errors. 499 U.S. at 306-12. As in Gonzalez-Lopez, there was an evidentiary record available for the Court's consideration. But in concluding there was no structural error, no part of its opinion addressed the evidence adduced at trial. As these cases demonstrate, a reviewing court does not determine whether an error is structural by perusing the evidence. It discovers that

21

answer by evaluating the nature of the error in relation to the damage it causes to the trial mechanism. So when the dissent faults us for not joining in an in-depth review of the evidence against Mr. K., it is actually adjuring us to look in the wrong place for signs of structural error.

¶32 If we could start with a harmless-error review, as the dissent does, we would have no need for the structural error doctrine at all, because we would just affirm all judgments in which we believe the error caused no harm. That, of course, depends on the assumption that no error can hide potentially useful information from us, that we can always perform a quantitative harmless-error analysis. But the whole point of the structural error doctrine is that some errors so undermine the proceeding's integrity that we cannot know what we do not know. The dissent's approach depends on the belief that a state-centric half-trial in which the defendant was not allowed to present his case-in-chief could not have deprived the court of any instructive information. Based on that assumption, it totted up the information that is in the record and declared it good enough. Nowhere, however, does it explore the actual question presented by this case, to wit, whether the circuit court's proceedings had enough structural integrity to adduce the information necessary to decide whether Mr. K. was an unfit

22

parent. So the dissent proceeded as if the error was not structural without ever inquiring into whether it actually was.[15]

¶33 Not even the precedent on which the dissent relied for the motive force of its reasoning supports its conclusion. The dissent says that Evelyn C.R. teaches us that the solution to the problem created by the circuit court's error is to borrow from the "disposition" phase of the trial to supply any deficit in the "grounds" phase. Dissent, ¶78 (citing Evelyn C.R., 246 Wis. 2d 1, ¶¶28, 32.). That is to say, the dissent believes we should import evidence and argument regarding the "best interests of the child" into the ex ante question of Mr. K.'s fitness as a parent. But that would be helpful only if we are looking for a way to paper over the circuit court's error. The first and second phases of the trial address different questions, so it is not immediately apparent how evidence and argument from the second could supply the structural integrity lacking in the first. Nor does the circuit court revisit the question of the parent's fitness in the "disposition" phase of the trial, so as a practical matter, the borrowed evidence and argument will always have precisely zero effect on the circuit court's determination in the "grounds" phase. A remedy that depends on ex post facto evidence and argument to justify a prior judicial determination is rhetoric, not reality.

---

[15] We will not address the substance of the dissent's harmless-error review. The error's structural nature means that any attempt at assessing its prejudicial effect is, by definition, an exercise in speculation.

¶34 Furthermore, Evelyn C.R. cannot inform our analysis because the asserted errors there and here are not the same. Although both cases involve parents who were not allowed to present their case-in-chief, that is the only similarity they share. In Evelyn C.R., the mother (Tykila S.) lost her right to present her case as a sanction for her failure to appear at trial. Id., ¶16. She did not contest the default and conceded that failing to appear deprived her of the right to challenge the State's case. Consequently, the right to put on one's case-in-chief was not at issue on appeal, and so it should come as no surprise that our opinion said nothing about it. Tykila S.'s assignment of error was instead that the circuit court failed to satisfy its independent statutory and constitutional obligation to identify sufficient evidence of record to support the state's case. Id. The issue, therefore, was a straightforward challenge to the sufficiency of the evidence. Our holding that evidence presented at the "disposition" phase may supply the deficit in the "grounds" phase, id., ¶36, says nothing about the nature of a parent's right to contest the State's case. So Evelyn C.R. can give us no instruction here for the simple reason that it did not address, even tangentially, the question now before the court.

¶35 We have little difficulty in concluding that the error presented in this matter "affect[s] the framework within which the trial proceeds, rather than being simply an error in the trial process itself." Weaver, 137 S. Ct. at 1907. The error did not just "affect" the framework, it completely eliminated

24

half of it. Further, the remaining half left the State as the sole expositor of the theory of the case. With so much of the adversarial nature of the trial excised, there is no adequate context within which to conduct a quantitative analysis of the missing testimony. Therefore, we cannot engage in a harmless-error review. The dissent worries that, in so concluding, we have recognized a structural error that has no provenance in prior pronouncements from either this court or the United States Supreme Court. Dissent, ¶38. Perhaps, however, neither of these courts have had occasion to address this issue because the proposition that a state-centric half-trial can produce a structurally sound result is so astonishing that no one has thought to make the argument before.

## IV. CONCLUSION

¶36 We hold that denying the defendant an opportunity to present his case-in-chief is a structural error, one that is "so intrinsically harmful as to require automatic reversal." Neder, 527 U.S. at 7. Consequently, we reverse the court of appeals

25

and remand the cause to the circuit court to conduct a new trial.[16]

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded with instructions.

¶37  REBECCA FRANK DALLET, J., did not participate.

---

[16] We decline the State's request that, should we reverse the court of appeals, we allow the circuit court to resume the trial where it left off. Perhaps the first part of the trial could be salvaged by appending Mr. K.'s presentation. That, however, would require a meticulous examination of the transcripts to satisfy ourselves that nothing the circuit court said or did during the State's case foreshadowed its decision to pretermit the proceedings. This is the type of "'inherently elusive [and] intangible'" error that is not susceptible to harmless-error review, which is why there must be a new trial ab initio. Nelson, 355 Wis. 2d 722, ¶33 (quoting Palmer v. Hendricks, 592 F.3d 386, 399 (3d Cir. 2010).

¶38 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting)*. Structural error is not a "legal rabbit" that a court can pull out of its hat, and thereby avoid a thorough examination of the record and the legal principles that must be reviewed when a parent's rights are terminated. Yet, that is just what the majority opinion has done today when it creates this new structural error, never before recognized by the United States Supreme Court or by this court.

¶39 Although I agree that the circuit court erred in shortening C.L.K.'s presentation at the factfinding hearing, the error was a trial error. It was not a structural error because it did not affect the framework of the entire trial. Rather, the framework of the trial was established through C.L.K.'s vigorous representation by counsel before an unbiased factfinder from which framework we can quantitatively assess the effect of the error. Accordingly, because the complained-of error is not structural, it is subject to a harmless-error analysis.

¶40 Furthermore, the error did not affect the validity of the finding that C.L.K. had abandoned his two young children or that it was in the best interests of the children that C.L.K.'s parental rights be terminated so that their foster parents can adopt them. Because I conclude that the circuit court error was harmless and, therefore, the two children who were abandoned by C.L.K. should have a permanent home in which to grow, I respectfully dissent from the majority opinion.

1

I.  BACKGROUND

¶41  On September 13, 2016, when J.E.H. and S.M.H. were five and six years old, respectively, the State filed a petition to terminate C.L.K.'s parental rights based on abandonment, as defined in Wis. Stat. § 48.415(1)(a)2. (2015-16).[1]  Both children have lived with their foster parents, who are their maternal great aunt and uncle, since March 17, 2014.

¶42  Prior to being removed from their mother's home, J.E.H.'s mother inflicted second and third-degree burns on both his feet, requiring hospitalization and extensive treatment for the burns and for the abuse he suffered.  The children's mother voluntarily terminated her parental rights to both children.  C.L.K. chose to retain his parental rights; therefore, a petition for involuntary termination was filed for C.L.K.

¶43  On March 23, 2017, the circuit court held the trial on the termination of C.L.K.'s parental rights, which is a two-step process.[2]  C.L.K. was present and he was represented by counsel at both hearings, as he has been throughout the proceedings that relate to J.E.H. and S.M.H.[3]

---

[1] All further references to Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

[2] The first hearing focuses on whether facts sufficient to support a ground for termination exists, and the second hearing focuses on whether termination of parental rights is in the child's best interest.  Wis. Stat. § 48.424 and Wis. Stat. § 48.427.

[3] For example, C.L.K. was represented by counsel at his deposition on January 24, 2017.

2

¶44 C.L.K testified. He admitted that from July of 2015 to September of 2016 he had no contact with the children. He did not visit them, or speak with them by phone, or send them letters or messages of any type. He also testified that during that 15-month period, he had no contact of any type with the foster parents. He admitted that he could have called the foster parents, but he did not try to do so. He also said he sent the foster parents no letters, nor did he try to have contact with the children or the foster parents through the "Bureau." When asked if he could have done so, he said "Yes, I could have." When asked, "Was there any reason why you could not?" C.L.K. said, "No."

¶45 C.L.K. was asked if he had any contact with anyone from the "Bureau of Milwaukee Child Welfare." Again, he said that he did not. He also was asked:

Q Did you make any effort to reach them to find out about your children?

A No, I did not.

Q Could you have?

A Yes, I could have.

Q Should you have?

A Yes, I should have.

Q Was there any reason why you did not?

A There's no reason at all. There's no excuse.

. . . .

Q What is the name of their school?

A I don't know.

3

Q Have you ever spoken to their doctor?

A No.

Q Have you ever spoken to their dentist?

A No.

Q Have you ever spoken to their therapist?

A No.

. . . .

Q So for the past three years what have you done to be involved in the children's lives?

A Nothing.

The court then asked C.L.K.'s attorney whether he had further questions for C.L.K. He said, "I'm going to reserve questioning if this case is allowed to proceed past this point, but I do have one or two at this point." Counsel then asked C.L.K. his reasons for having sparse contact with his children and the foster parents:

Q You mentioned the former social worker led you to believe -- what was it?

A That I wasn't allowed to have any information concerning where my children are located.

Q And what led you to believe that?

A That's what she told me.

. . . .

Q What information?

A I was asking for information to get a number for Ms. Cupil so I can call my children, but I was told I couldn't have that number.

. . . .

4

Q So did that prevent you from having contact with your children?

A Yes.

¶46 On re-direct, the State asked:

Q And since they were brought into care, you've known where they were because they've always been with the Cupils.

A Yes.

Q And you testified that you made no efforts during that time period to get in touch with the Cupils.

A Yes.

Q And you testified in your deposition that you could have called, but you didn't.

A I could have tried harder, yes. That's what I meant when I said I could have called.

¶47 After C.L.K.'s testimony the State submitted certified copies of relevant orders, which the court admitted into evidence. The State then rested.

¶48 As the State did so, counsel for C.L.K. began to argue to the court:

Well, your Honor, I think at this stage you have to take it in the light most favorable to [C.L.K.]. And to believe [C.L.K.] has good reason for not having communication over that period of time we're talking about is that he, in his mind -- it's subjective -- but he, in his mind, thought he couldn't because of what was told to him directly by a social worker. And also that social worker, [C.L.K.] thought, had a way to communicate with him if he or she wanted to. . . .

So I think [C.L.K.], again, at this point, believing everything that he says, that he gives a good enough reason to have not had the communication.

5

> THE COURT: Well, you've argued a motion that hasn't been made yet; although I suspected it was coming.

¶49 The record shows that counsel for C.L.K. actually was arguing to dismiss the State's case because C.L.K.'s stated reason constituted good cause for not contacting the children, the foster parents or the social worker. However, the circuit court interpreted counsel's argument as opposing a State motion for a directed verdict, which the State never made.

¶50 It is not clear from the transcript whether the attorney for the State thought the court's reference to a "directed verdict" was a motion to dismiss the State's case, which would have been logical given that it was defense counsel who made the argument when the State rested, or something else. Counsel for the State then summarized the overwhelming evidence of abandonment that had been presented by C.L.K.'s own testimony.

¶51 Before the court ruled, counsel for C.L.K. said, "[i]f this is not a directed verdict motion at this point then and the State rests its case in chief, then I'm going to ask to be able to put my client on the stand and finish our side of the case."

¶52 The circuit court clearly interpreted defense counsel's argument at the conclusion of the State's proof on abandonment as arguing against a State motion for a directed verdict in favor of the State on the ground of abandonment, which the State never made. Therefore, after a brief argument by the guardian ad litem, the court found:

> THE COURT: I'm granting the implicit motion for a directed verdict. I get it, that in [C.L.K.]'s mind

6

there was justification for what happened here. But legally, there is not. And I'm addressing only the abandonment claim.

The court then held that the State had met its burden of proof of abandonment as a ground for terminating C.L.K.'s parental rights.[4]

¶53 Subsequently, with the agreement of counsel, the court held the dispositional hearing that same day. The State's first witness was Ms. Cupil, the foster mother.

¶54 Ms. Cupil testified that the children have resided with her since March of 2014. She testified that she and John, her husband, wanted to adopt the children. She explained that she was the children's great aunt and that she loved the

---

[4] Abandonment pursuant to Wis. Stat. § 48.415(1)(a)2. was alleged here, which provides in relevant part:

(1) ABANDONMENT. (a) Abandonment, which, subject to par. (c), shall be established by proving any of the following:

. . . .

2. That the child has been placed, or continued in a placement, outside the parent's home by a court order . . . and the parent has failed to visit or communicate with the child for a period of 3 months or longer.

. . . .

(c) Abandonment is not established under par. (a)2. . . . if the parent proves all of the following by a preponderance of the evidence:

1. That the parent had good cause for having failed to visit with the child throughout the time period specified in par. (a)2. . . . .

2. That the parent had good cause for having failed to communicate with the child throughout the time period specified in par. (a)2. . . . .

7

children very much. She said that when the children first came to live with her and her husband they were two and four years old, respectively. At the date of the hearing, March 23, 2017, they were five and seven years old.[5]

¶55 She explained that the children were well, but that both children had Von Willebrand's Disease.[6] She said she had to be mindful of cuts and if they hit their heads, because if they bled, the bleeding could continue. She said that they regularly visited the doctor, but their symptoms were mild, and that the children's medical condition did not affect their desire to adopt them.

¶56 She said that the children's mother, who is incarcerated for severely burning the younger child, regularly sends the children notes and has talked on the phone with them. In regard to C.L.K., she testified:

> Q What kind of relationship do the kids have with [C.L.K.]?
>
> A None.
>
> Q Do they ever ask about him in the home?
>
> A No.
>
> Q Have they ever asked to go see him?

---

[5] The children are now eight and ten years of age.

[6] Von Willebrand's Disease is an inherited disorder wherein the person's blood clots more slowly, which may cause problems from cuts, or nose bleeds, or other soft tissue injuries. Mayo Clinic Von Willebrand Disease at https://mayoclinic.org/diseases-conditions/von-willebrand-disease/symptoms, last visited December 14, 2018.

8

A   No.

Q   Have they ever asked to call him?

A   No.

Q   Now, there was a little over a year-long period where there were no visits; correct?

A   Yes.

Q   Was [C.L.K.] in contact with your home at all during that time?

A   No.

Q   Did he send any letters during that time?

A   No.

. . . .

Q   Now, have you ever talked with the children about where they want to stay?

A   Yes.

Q   What have they said?

A   We want to stay here with you, mommy and daddy.

. . . .

Q   Do you think you could provide [S.M.H.] and [J.E.H.] with a permanent and stable situation for their life?

A   Yes, we can.

¶57   C.L.K.'s counsel then questioned Ms. Cupil in regard to C.L.K.'s parental rights:

Q   Do you think it's necessary to terminate [C.L.K.]'s parental rights?

A   Yes.

Q   Why?

9

A  He hasn't been there.  I mean, he has not been there.  We have been their family.  We have been there for them every day from day one to now.  We have been there.

He has been there because it's court-ordered. When it wasn't, he didn't make any effort before then. He didn't call between times.  He doesn't make any efforts to be at any of their appointments.  He did not call just because.  He only called because when he was instructed to.  He only called at the times they told him to call.  He didn't do anything more than that.  He only did what he was told to do.

. . . .

So him being the biological father, then be the father.  See, I didn't say that I have a problem with him.  I'm just saying there is no relationship because he made no effort to make a relationship with us or his children.  That's what I'm saying to you.

¶58  The case manager, Ms. Mariah Ahles, was the next witness.  She had been in charge of the children's case since September of 2015.

¶59  She was asked about the suitability of the Cupils as an adoptive home.

Q  Do you believe the Cupils are a good fit for the children?

A  Yes, I do.

Q  Why is that?

A  The Cupils have demonstrated over the last three years that they are able to make sure that the children's basic needs are met such as food, shelter, their schooling.

They work with their school very well to make sure the kids' mental health needs are met at school. They've been able to get them to the doctor, the dentist.  When they had therapy services, they were in therapy.

10

They've also been able to build relationships with the children. The children have built relationships with the Cupils' other children and their maternal great grandmother.

. . . .

Q Have the children ever asked to go see [C.L.K.]?

A They have never mentioned him besides when I mention him.

Q Have they ever asked to call him?

A No.

Q Have they ever just spoke about him?

A No.

. . . .

Q Do you believe a termination and adoption would provide the children with more permanence and stability than any other outcome?

A I do.

¶60 She explained that she called C.L.K. monthly attempting to make connections between him and the children. His phone became disconnected; however, the letters she sent to the mailing address C.L.K. gave were not returned.

¶61 C.L.K.'s attorney questioned Ms. Ahles about visits that the children have had with C.L.K and their responses to those visits, indicating that their responses generally were positive.

¶62 The State then rested its termination of parental rights evidentiary submissions. C.L.K.'s attorney first moved the defense exhibits that he had used during the proceedings into evidence. He then called C.L.K. to the witness stand.

11

C.L.K. began by explaining that he, S.M.K. and the children's mother lived together when S.M.K. was nine months old until she was about two.

Q And can you tell me what you did, just generally? Generally, what was your role?

A Generally, I went to work. And then when I came home from work, I helped change diapers or whatever else I needed to do for [S.M.K.] at that time.

Q All right. And then you moved away, is that it, or separated somehow?

A Yes. We separated.

Q Okay. And then you had another child together?

A By the time we separated, she was pregnant with [J.E.H.] then.

. . . .

Q Okay. So are you saying the mother of the children essentially stopped you from visiting the children at some point?

A Yes.

Q Do you know about when that was?

A I'm going to say [J.E.H.] was about one, a little over one. One and a half, probably.

Q Okay. And then at some point you moved to Green Bay; is that right?

A Yes.

Q When was that?

A That was in July of 2015.

. . . .

Q Are you currently working?

12

A  Yes.

Q  Can you describe your -- Tell us about your job.

A  I'm a PCW for my god son, Mateo Escavel.

Q  All right.  And where do you currently live? Is it a house you own or a house you rent?

A  No.  I'm living with a friend right now.

Q  Okay.   You understand you're up here testifying because you're asking that you be reunited -- or have your children returned; right?

A  Correct.

Q  You understand that, you know, the reality is they're probably not going to return them to you if you don't have a place for them to live; right?

A  Correct.

. . . .

Q  What about health insurance.  How would the kids, if at all, be covered by health insurance?

A  I'm already in the process of looking for a second job.  And the second job, I'll make sure it do have insurance so I can get it.

. . . .

Q  And it was mentioned in testimony earlier that you're currently in therapy.

A  Yes.

. . . .

Q  Okay.  And can you tell me what your therapy -- what you cover in therapy?

A  We  cover  my  thinking  pattern  and  my depression.

. . . .

13

Q Is there anything else you want to tell the Court here regarding reunification with your children?

A I know -- Like I said, I know I messed up. But that mess-up don't make me a bad parent. I mean, nobody is perfect. I mean, everybody makes mistakes. I made mine. I learned from it. To me, that should be the most important thing, you learn from your mistakes.

¶63 The State then conducted cross-examination as did the guardian ad litem. The guardian ad litem's questioning focused on the extremely sparse contacts that C.L.K. had with the children and concerns about his mental health.

Q You've had -- Every other week you've had three visits in the last two years with the kids supervised; correct?

A Yes.

Q And, also, you've had the opportunity to have phone calls after those visits on Sundays.

A Yes.

Q And you haven't had those phone calls, have you?

A No.

Q So you've had these three visits and that's it; correct?

A Yes.

Q In terms of the medication and the mental health treatment you are getting at the present time, you've been diagnosed with bipolar disorder?

A Yes.

Q And your doctors recommended medication for that?

A Yes.

Q And you're not taking medication, are you?

14

A   No.

¶64 When C.L.K.'s testimony concluded, the court asked his attorney whether he had other witnesses to present. Counsel said he had no further witnesses. The argument of counsel followed. The court took the case under advisement and issued the written ruling that terminated C.L.K.'s parental rights, which is the subject of this review.

¶65 The court of appeals affirmed, and I would do likewise because any error in shortening the factfinding on abandonment was abrogated by the evidentiary hearing that continued that same day. C.L.K., who was his own only witness in defense, testified extensively about his contacts with the children and why he was absent from their lives for extended periods of time. No structural error occurred here. The majority errs, and I respectfully dissent.

## II.   DISCUSSION

### A.   Standard of Review

¶66 Whether an error is structural and, therefore, not subject to a harmless error review, is a question of law for our independent consideration. State v. Nelson, 2014 WI 70, ¶18, 355 Wis. 2d 722, 849 N.W.2d 317. If an error, though structural, arises through ineffective assistance of counsel, we determine as a matter of law whether counsel's deficient performance was prejudicial. Weaver v. Massachusetts, 137 S. Ct. 1899, 1910 (2017). If the error is not structural, we independently determine whether the error was harmless. Nelson, 355 Wis. 2d 722, ¶18.

15

B. Structural Error

1. General Principles

¶67 Structural error is a judicially created criminal law doctrine. Structural errors arise out of concerns for constitutional principles that are required to be upheld to achieve a fair trial. Arizona v. Fulminante, 499 U.S. 279, 282 (1991). Structural errors affect the framework in which the entire trial takes place; they differ from other serious errors that may occur in a trial. State v. Martin, 2012 WI 96, ¶43, 343 Wis. 2d 278, 816 N.W.2d 270. Although the concept of structural error developed in a criminal law context, it has been applied in a termination of parental rights proceeding, which is civil in nature. State v. Shirley E., 2006 WI 129, ¶63, 298 Wis. 2d 1, 724 N.W.2d 623.

¶68 In regard to structural error, we have adopted the United States Supreme Court's framework for assessing trial errors that are of a constitutional nature. Nelson, 355 Wis. 2d 722, ¶31 (explaining that we have "embraced" the federal method for assessing when error may be analyzed as harmless and when that analysis may not be employed because the error is structural). When the effect of an error on the outcome of a trial is capable of assessment, the error is not structural. Id., ¶5 (citing Fulminante, 499 U.S. at 307-08). Stated otherwise, a trial error, i.e., an error that occurs in the presentation of the case to the factfinder and which therefore may be quantitatively assessed in the context of other evidence, is not structural. Fulminante, 499 U.S. at 307-08.

16

¶69 The United States Supreme Court decision in Weaver provides a helpful summary and a clear roadmap for assessing whether a constitutional error is structural. Weaver explained that, generally, structural errors fall within one of three categories, although the categories may overlap. They are: (1) affect an underlying right that protects some interest other than an adverse determination for the defendant; (2) the error's quantitative effect on the trial is too hard to measure; and (3) fundamental unfairness results from the error. Weaver, 137 S. Ct. at 1908. Stated otherwise, structural errors are so profound in their effect that "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." Rose v. Clark, 478 U.S. 570, 577-78 (1986). However, "if the defendant had counsel and was tried before an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." Id. at 579.

¶70 There are many errors that can occur during a trial, some are serious and require reversal and some are harmless, not requiring reversal. However, not all serious errors are structural; the list of structural errors is limited: Complete denial of the right to counsel has been held to be structural error, Gideon v. Wainwright, 372 U.S. 335 (1963); as has trial before a biased judge, Tumey v. Ohio, 273 U.S. 510 (1927); racial discrimination in the selection of a grand jury, Vasquez v. Hillery, 474 U.S. 254 (1986); and the complete denial of

17

self-representation at trial, McKaskle v. Wiggins, 465 U.S. 168 (1984).

¶71 The above-listed errors affect the framework in which a trial is conducted. Their effect starts at the beginning of the trial and continues throughout the trial. There is no relief from the burden they impose.

¶72 However, Weaver recently clarified that a new trial does not automatically follow from a determination that a trial error was structural. Weaver, 137 S. Ct. at 1910 ("'[S]tructural error' carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.'").

¶73 In regard to the denial of the right to a public trial, the structural error that was the focus of Weaver, the court concluded that because the error was raised in the course of an ineffective assistance of counsel review, the defendant had to prove prejudice before a new trial would be ordered. Id. Because Weaver failed in that proof, he failed in his efforts to obtain a new trial. Therefore, as the United States Supreme Court has explained, the conclusion that a structural error occurred does not automatically result in a new trial——sometimes it does and sometimes it does not. Id.; see also State v. Pinno, 2014 WI 74, ¶63, 356 Wis. 2d 106, 850 N.W.2d 207 (concluding that the denial of "the Sixth Amendment right to a public trial may be forfeited when a defendant knows that the

18

judge has ordered the public to leave the courtroom but does not object.").

### 2. C.L.K.'s Parental Rights Trial

¶74 C.L.K. was represented by competent counsel in all proceedings before and during the two-step trial.[7] The trial was public and the adjudicator was impartial. Accordingly, there is a "strong presumption" that any error by the circuit court was not structural. Rose, 478 U.S. at 579.

¶75 Although evidence on grounds for termination of C.L.K.'s parental rights and on C.L.K.'s reason for failing to communicate with his children and with the foster parents was presented at the first hearing, C.L.K. presented additional testimony relative to abandonment at the second hearing upon direct examination by his counsel. It was after the second hearing and argument of counsel that the court decided to terminate C.L.K.'s parental rights. These events are similar to the process that occurred in another case where a termination of parental rights resulted, Evelyn C.R. v. Tykila S., 2001 WI 110, 246 Wis. 2d 1, 629 N.W.2d 768.

¶76 In Evelyn C.R., the issue was whether Tykila's parental rights should be terminated because she had abandoned her son. Id., ¶1. When Tykila violated a court order to appear in person at the factfinding hearing, the circuit court entered a default judgment on the grounds of abandonment without taking

---

[7] No allegation of ineffective assistance of counsel has been raised.

sufficient testimony to support a finding of abandonment by clear and convincing evidence. Id., ¶3.

¶77 We held that the circuit court erred in making a finding of abandonment without first taking evidence sufficient to support that finding. Id., ¶19. We explained that the procedure used "failed to comply with the constitutional and statutory requirements for termination of parental rights." Id. However, we also explained that at the second step in the two-step statutory process applicable to termination of parental rights trials, the "parent's rights are not ignored. The parent has the right to present evidence and be heard." Id., ¶23.

¶78 We then explained, that notwithstanding the error that occurred at the factfinding hearing, "we nonetheless must examine the entire record to determine whether it provides a factual basis to support the court's finding of grounds for termination." Id. at ¶32. We did not ignore what had occurred at the second hearing where proof of abandonment was provided. We relied on Wis. Stat. § 805.18(2) in part for that conclusion. Section 805.18(2) provides in relevant part:

> No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of . . . error as to any matter of pleading or procedure, unless . . . after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

Id., ¶28 (emphasis in Evelyn C.R.).

¶79 So too, in the case before us, we must examine the entire trial record to determine whether the error of shortening

20

the factfinding hearing was abrogated by the participation and evidence that C.L.K. presented at the second step——i.e., the dispositional hearing. Id., ¶33. Stated otherwise, we must consider C.L.K.'s testimony at the dispositional hearing relative to abandonment in order to assess whether the error at the grounds hearing permeated the entire trial.

### a. Structural Error

¶80 I begin my discussion, based on the record before us and the applicable law in which structural error is grounded. It should be noted that the majority opinion refuses to consider the entire trial that took place before C.L.K.'s parental rights were terminated. It also does no analysis of the law when concluding that the error at the factfinding hearing was structural error. It gives only lip service to the "strong presumption" that an error is not structural when counsel was afforded and the factfinder was impartial, which is required by Rose v. Clark. It does not explain how the error so affected the trial that its effect could not be measured or that its burden continued from the start of the trial without relief to the end of the trial after which C.L.K.'s parental rights were terminated. Instead, ipse dixit, the majority opinion discovers a new type of structural error.[8]

¶81 However, the structural error factors identified in

---

[8] Neither United States Supreme Court, nor this court, has ever said that affecting the adversary system is structural error.

_Weaver_ are my guides.[9] As I explain as this discussion of structural error progresses, the framework in which this termination of parental rights trial was conducted was sound. It consisted of vigorous representation by counsel before an unbiased judge. Although protection of an interest beyond that of an adverse decision for a defendant can be structural error, for example when there is a complete denial of the right to counsel at trial, as in _Gideon_, the majority opinion identifies no such interest, and I could find none in this record.

¶82 The majority eloquently and expansively expounds on the merits of the adversary system.[10] It grounds its newly minted structural error in the alleged failure to permit "the respondent the option of presenting his case-in-chief" at the first step of a two-step trial.[11] However, the majority opinion sets out no reasoning and applies no structural error precedent to support its broad assertion that an error at one hearing cannot be abrogated by presentations later in the trial.

¶83 Furthermore, the quantitative effect of the error that occurred in the factfinding hearing is easily measured. Review

---

[9] In ¶69 above, I identified three categories into which structural errors generally fall. As an assist to the reader, I repeat them here. They are: (1) affect an underlying right that protects some interest other than an adverse determination for the defendant; (2) the error's quantitative effect on the trial is too hard to measure; and (3) fundamental unfairness results from the error. _Weaver v. Massachusetts_, 137 S. Ct. 1899, 1908 (2017).

[10] _See e.g.,_ majority op., ¶¶17-22.

[11] Majority op., ¶16.

22

of the full record, i.e., both hearings that were held March 23, 2017, shows that C.L.K. fully testified about why he had had so little contact with his children and the foster parents. He explained why he thought he had an excuse for "messing-up" and that he loved his children. The foreshortening of C.L.K.'s testimony that occurred at the first-step of the trial, was abrogated by his direct testimony at the second-step, as well as by his counsel's thorough cross-examination of all witnesses the State presented at both hearings. As Nelson explained, when the effect of the error on the outcome of a trial is capable of assessment, the error is not structural. Nelson, 355 Wis. 2d 722, ¶5 (citing Fulminante, 499 U.S. at 307-08). However, notwithstanding the law and the record, the majority opinion ignores the second hearing and all of C.L.K.'s direct testimony.

¶84 In addition, C.L.K. had no witnesses who were not allowed to testify, as his counsel explained twice.[12] First, at the factfinding hearing counsel said, "[i]f this is not a directed verdict motion at this point then and the State rests its case in chief, then I'm going to ask to be able to put my client on the stand and finish our side of the case." C.L.K., himself, was his only witness. Second, his attorney confirmed

---

[12] The majority opinion states, "the circuit court did not allow him to decide who his witnesses would be, the order in which they would testify, or the evidence he would seek from each one." Majority. op., ¶23. The transcript of the trial conclusively proves that C.L.K. had only one witness, himself, at both hearings and that he testified fully. There is absolutely nothing in the record to indicate that C.L.K. had any witnesses other than himself whom he sought to present during any part of the trial.

23

that C.L.K. had no other witnesses to present when C.L.K.'s testimony at the dispositional hearing was concluded and counsel told the court that he had no further witnesses. And think about it, who besides C.L.K. would know why he did not see, speak with or attempt to contact his two young children and their foster parents for 15 months.

¶85 C.L.K. had a full opportunity to explain why his absence should not be sufficient to prove abandonment. The transcript of the trial conclusively demonstrates that. Therefore, we can measure the quantitative effect of this error, which we could not do if this error were structural. This trial was not fundamentally unfair.

¶86 Furthermore, Evelyn C.R., which also involved an ultimate finding of abandonment when the factfinding hearing had been deficient in regard to proof of abandonment, requires that we consider the entire record when a proof problem occurs at the factfinding hearing. Evelyn C.R., 246 Wis. 2d 1, ¶32 (explaining that "we nonetheless must examine the entire record to determine whether it provides a factual basis to support the court's finding of grounds for termination."). That is, on review, we must consider evidence presented at both hearings that are components of a termination of parental rights trial before concluding that an initial error in one part of the trial is sufficient to require a new trial. Id., ¶¶23, 32.

¶87 Precedent and fundamental fairness to C.L.K. and to his two children require that we consider evidence presented at both the factfinding hearing and the dispositional hearing when

24

determining the effect of the error on the trial. Id. After having fully considered the record and the law, I conclude that structural error is nowhere to be found in this record.

b. Harmless Error

¶88 Because the error that occurred is not structural, I examine whether it is harmless. State v. Travis, 2013 WI 38, ¶66, 347 Wis. 2d 142, 832 N.W.2d 491. The State has the burden of proving the error was harmless. State v. Tiepelman, 2006 WI 66, ¶3, 291 Wis. 2d 179, 717 N.W.2d 1.

¶89 A termination of parental rights proceeding is civil in nature. Door Cty. DHFS v. Scott S., 230 Wis. 2d 460, 465, 602 N.W.2d 167 (Ct. App. 1999). Wisconsin has codified its harmless error doctrine in Wis. Stat. § 805.18(2), which we quoted in Evelyn C.R. and which I repeated at ¶78 above.

¶90 Notwithstanding that codification, which is applicable in a criminal law context as well as a civil context, our decisions have expressed harmless error in a variety of ways:

> [I]n order to conclude that an error "did not contribute to the verdict" within the meaning of Chapman, a court must be able to conclude "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."

State v. Harvey, 2002 WI 93, ¶48 n.14, 254 Wis. 2d 442, 647 N.W.2d 189 (citation omitted).

> In other words, if it is "clear beyond a reasonable doubt that a rational jury would have convicted absent the error," then the error did not "contribute to the verdict."

Travis, 347 Wis. 2d 142, ¶67 n.54.

> [T]he standard for harmless error is the same for civil as well as criminal cases.

25

Evelyn C.R., 246 Wis. 2d 1, ¶43 (Crooks, J. concurring).

> Wisconsin Stat. § 805.18(2) provides that an error requires reversal only where it has "affected the substantial rights of the party" claiming error. . . . An error is significant enough to undermine confidence in the outcome if there is a reasonable probability of a different outcome without the error.

Id., ¶46. I conclude that the complained-of error in the presentation of evidence in a termination of parental rights trial is harmless unless there is a reasonable probability that absent the error, the trial outcome would have been different, i.e., the parent's rights would not have been terminated.

¶91 The shortening of C.L.K.'s testimony at the first hearing is the error of which he complains. In order to assess whether that error was harmless, we must consider the record of the entire termination of parental rights trial. Waukesha Cty. v. Steven H., 2000 WI 28, ¶58, 233 Wis. 2d 344, 607 N.W.2d 607 (concluding that "[a] factual basis for several of the allegations in the petition can be teased out of the testimony of other witnesses at other hearings"); Evelyn C.R., 246 Wis. 2d 1, ¶32 (concluding that we "must examine the entire record to determine whether it provides a factual basis to support the court's finding of grounds for termination.").

¶92 Upon review of the applicable law and the entire transcript of the two-step trial after which C.L.K.'s parental rights were terminated, it is apparent that C.L.K. did not suffer a violation of his substantial rights because the outcome of the trial would not have been different if he had given the testimony relative to abandonment at the first hearing that he

26

gave at the second hearing.  Accordingly, I conclude that the State has proved that it is not reasonably probable that there would have been a different outcome if the error had not occurred.  Therefore, the error was harmless.

### III.  CONCLUSION

¶93  In conclusion, although I agree that the circuit court erred in shortening C.L.K.'s presentation at the factfinding hearing, the error was a trial error.  It was not a structural error because it did not affect the framework of the entire trial.  Rather, the framework of the trial was established through C.L.K.'s vigorous representation by counsel before an unbiased factfinder from which framework we can quantitatively assess the effect of the error.  Accordingly, because the complained-of error is not structural, it is subject to a harmless-error analysis.

¶94  Furthermore, the error did not affect the validity of the finding that C.L.K. had abandoned his two young children or that it was in the best interests of the children that C.L.K.'s parental rights be terminated so that their foster parents can adopt them.  Because I conclude that the circuit court error was harmless and, therefore, the two children who were abandoned by C.L.K. should have a permanent home in which to grow, I respectfully dissent from the majority opinion.

¶95  I am authorized to state that ANNETTE KINGSLAND ZIEGLER, J. joins this dissent.